# EXHIBIT A

CN: 2320017632

**SN: 3**

PC: 1

# FILED

JAN 17 2023

TIMOTHY W. FITZGERALD
SPOKANE COUNTY CLERK

(Copy Receipt)                    Clerk's Date Stamp

|  **SUPERIOR COURT OF WASHINGTON COUNTY OF SPOKANE** | **JUDGE ANNETTE S. PLESE 98** |
|---|---|
| DDD INC<br><br>**Plaintiff(s)/Petitioner(s),**<br>**vs.**<br>LUX VENDING LLC<br><br>**Defendant(s)/Respondent(s).** | **CASE NO. 23-2-00176-32**<br><br>**CASE ASSIGNMENT NOTICE AND ORDER (NTAS)**<br><br>**CASE STATUS CONFERENCE DATE: APRIL 21, 2023 AT 8:30 AM** |

## ORDER

YOU ARE HEREBY NOTIFIED that this case is preassigned for all further proceedings to **JUDGE Annette S. Plese.**

**You are required to attend a Case Status Conference before your assigned judge on the date also noted above. The Joint Case Status Report must be completed and brought to the Status Conference. A Case Schedule Order, with the trial date, will be issued at the Status Conference.**

Under the individual calendar system, the court will operate on a four-day trial week. Trials will commence on Monday, Tuesday, Wednesday or Thursday. Motion Calendars are held on Friday. All motions, other than ex parte motions, must be scheduled with the assigned judge. Counsel must contact the assigned court to schedule motions and working copies of all motion pleadings must be provided to the assigned court at the time of filing with the Clerk of Court. Pursuant to LCR 40 (b) (9), motions must be confirmed no later than 12:00 noon three days before the hearing by notifying the judicial assistant for the assigned judge.

Please contact the assigned court to schedule matters regarding this case. You may contact the assigned court by phone, court department e-mail or through the Spokane County Superior Court web page at **https://www.spokanecounty.org/4625/Superior-Court**

DATED: 01/17/2023

JULIE M. MCKAY
PRESIDING JUDGE

**NOTICE: The plaintiff shall serve a copy of the Case Assignment Notice on the defendant(s).**

CASE ASSIGNMENT NOTICE       LAR 0.4.1(b)    (4/2001)   CASGN                    Page 1 of 1

# SPOKANE COUNTY CLERK INDEXING SHEET

*Check **one** box that best describes this case. This classification in no way affects the legal action of the case*

## CASE NO.

**23200176-32**

CN: 2320017632  SN: 1  PC: 1

## CIVIL

### Tort
- [ ] * Medical Malpractice (MED)
- [ ] * Personal Injury (PIN)
- [ ] * Property Damage (PRP)
- [ ] * Wrongful Death (WDE)
- [ ] * Other Malpractice (MAL)
- [ ] * Tort Motor Vehicle (TMV)
- [ ] * Tort – Other (TTO)
- [ ] Victim of Motor Vehicle Theft (VVT)

### Contract/Commercial
- [ ] Collection (COL)
- [ ] Commercial Non-Contract (COL)
- [x] * Commercial/Contract (COM)

### Property Rights
- [ ] * Condemnation (CON)
- [ ] * Foreclosure (FOR)
- [ ] * Quiet Title (QTI)
- [ ] * Land Use Petition (LUP)
- [ ] Unlawful Detainer (UND)
- [ ] Property Fairness Act (PFA)

### Protection Order
- [ ] Canadian DV Protection Order (CNV)
- [ ] Civil Harassment (CPO)
- [ ] Domestic Violence Protection (CPO)
- [ ] Extreme Risk Protection Order (XRP)
- [ ] Extreme Risk Protection Order Under 18 (XRU)
- [ ] Foreign Protection Order (FPO)
- [ ] Sexual Assault Protection (CPO)
- [ ] Stalking Protection (CPO)
- [ ] Vulnerable Adult Protection (CPO)

### Other Complaint/ Petition
- [ ] Abusive Litigation (ABL)
- [ ] Change of Name (Non-Confidential) (CHN)
- [ ] * Injunction (INJ)
- [ ] Malicious Harassment (MHA)
- [ ] Petition for Civil Comm (Sexual Predator) (PCC)
- [ ] Seizure of Prop from Commission of a Crime (SPC)
- [ ] Seizure of Prop from a Crime (SPR)
- [ ] Property Damage – Gangs (PRG)
- [ ] Public Records Act (PRA)
- [ ] School District – Required Action Plan (SDR)
- [ ] Miscellaneous (MSC)
- [ ] Emancipation of Minor (EOM)
- [ ] * Minor Settlement (MST)
- [ ] * Structured Settlement (MSC)
- [ ] Relief from Duty to Register (RDR)
- [ ] Restoration of Firearm Rights (RFR)

### Writs
- [ ] Writ of Habeas Corpus (WHC)
- [ ] Miscellaneous Writs (WMV)

### Appeal/Review
- [ ] * Administrative Law Review (ALR)
- [ ] * Lower Court Appeal – Civil (LCA)
- [ ] * Lower Court Appeal – Traffic (LCI)
- [ ] * Dept. of Licensing Revocation (DOL)

### Judgment
- [ ] Tax Warrants (TAX)
- [ ] Abstract of Judgment (ABJ)
- [ ] Transcript of Judgment (TRJ)
- [ ] Foreign Judgment (FJU)

## DOMESTIC
- [ ] ** Annulment – Invalidity (INV)
- [ ] ** Dissolution with Children (DIC)
- [ ] ** Dissolution – No Children (DIN)
- [ ] ** Dissolution Dom Partnership with Children (DPC)
- [ ] ** Dissolution Dom Partnership – No Children (DPN)
- [ ] ** Invalidity – Domestic Partnership (INP)
- [ ] ** Legal Separation (SEP)
- [ ] ** Legal Separation – Domestic Partnership (SPD)
- [ ] ** Parenting Plan/Child Support (PPS)
- [ ] * Committed Intimate Relationship w/Children (CIR)
- [ ] * Committed Intimate Relationship -No Children (CIR)
- [ ] * DeFacto Parentage (DFP)
- [ ] Modification (MOD)
- [ ] Modification: Support Only (MDS)
- [ ] Out of State Custody (OSC)
- [ ] Foreign Judgment (FJU)
- [ ] Mandatory Wage Assignment (MWA)
- [ ] Miscellaneous (MSC)
- [ ] *** Relative Visitation (RCV)
- [ ] Reciprocal, Respondent-In-County (RIC)
- [ ] Reciprocal, Respondent-Out-of-County (ROC)

## PATERNITY/ADOPTION

### Paternity
- [ ] Paternity (PAT)
- [ ] Paternity/URESA/UIFSA (PUR)

### Adoption
- [ ] Adoption (ADP)
- [ ] Confidential Intermediary (MSC)
- [ ] Relinquishment (REL)
- [ ] Initial Pre-Placement Report (PPR)

### DV/AH – Name Change
- [ ] Confidential Name Change (CHN)

## PROBATE/GUARDIANSHIP
- [ ] Absentee (ABS)
- [ ] Disclaimer (DSC)
- [ ] Estate (EST)
- [ ] Foreign Will (FNW)
- [ ] Will Only (WLL)
- [ ] Miscellaneous (MSC)
- [ ] Trust (TRS)
- [ ] Trust/Estate Dispute Resolution (TDR)
- [ ] Sealed Will Repository (SWR)
- [ ] Small Estate Affidavit (SEA)
- [ ] Guardianship (GDN)
- [ ] Guardianship of the Person (GDN)
- [ ] * Minor Guardianship Custody (MGC)
- [ ] Non-Probate Notice to Creditors (NNC)
- [ ] Emergency Minor Guardianship (EMG)
- [ ] Emergency Minor Guardianship/Conservatorship (EGC)
- [ ] Minor Conservatorship (MCE)
- [ ] Standby Minor Guardianship (SMG)
- [ ] Limited Guardianship (LGD)
- [ ] Limited Guardianship of the Person (LGP)
- [ ] Limited Guardianship of the Estate (LGE)
- [ ] * Minor Settlement (MST)

**ATTENTION:**
- CASES MARKED WITH AN * RECEIVE A CASE ASSIGNMENT NOTICE
- CASES MARKED WITH ** RECEIVE A CASE ASSIGNMENT NOTICE AND A COURT'S AUTOMATIC TEMPORARY ORDER
- CASES MARKED WITH *** RECEIVE A CASE ASSIGNMENT NOTICE WITH A JUDGE ONLY

CN: 2320017632

**SN: 2**

PC: 18

# FILED

JAN 17 2023

TIMOTHY W. FITZGERALD
SPOKANE COUNTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

DDD, INC., a Washington corporation,

        Plaintiff,

   v.

LUX VENDING, LLC D/B/A BITCOIN DEPOT, a foreign limited liability company,

        Defendant.

NO. **23200176-32**

SUMMONS

TO THE ABOVE-NAMED DEFENDANT:

A lawsuit has been started against you in the above-entitled Court by DDD, INC., Plaintiff. Plaintiff's claim is stated in the written Complaint for Fraud and Declaratory Relief, a copy of which is served upon you with this Summons.

In order to defend against this lawsuit, you must respond to the Complaint by stating your defense in writing, and by serving a copy upon the person signing this Summons within twenty (20) days after the service of this Summons, excluding the day of service if served within the state of Washington and sixty (60) days if served outside the state of Washington, or a default judgment may be entered against you without notice. A default judgment is one where Plaintiff is entitled to what it asks for because you have not responded. If you serve a

SUMMONS - 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

Notice of Appearance on the undersigned persons, you are entitled to notice before a default judgment may be entered.

You may demand that the Plaintiff file this lawsuit with the Court. If you do so, the demand must be in writing and must be served upon the persons signing this Summons. Within fourteen (14) days after you serve the demand, the Plaintiff must file this lawsuit with the Court, or the service on you of this Summons and Complaint will be void.

If you wish to seek the advice of an attorney in this matter, you should do so promptly so that your written response, if any, may be served on time.

This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the state of Washington.

DATED this 17th day of January, 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By: _____
MICHAEL R. MERRITT, WSBA #60094
Counsel for Plaintiff

SUMMONS - 2

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

**FILED**

JAN 17 2023

TIMOTHY W. FITZGERALD
SPOKANE COUNTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

DDD, INC., a Washington corporation,

         Plaintiff,

    v.

LUX VENDING, LLC D/B/A BITCOIN DEPOT, a foreign limited liability company,

         Defendant.

NO. **23200176-32**

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF

Plaintiff, DDD, Inc., by and through its attorneys of record, the law firm of Hawley Troxell Ennis & Hawley LLP, hereby complains and alleges as follows:

**I.**
**PARTIES, JUSRISDICTION AND VENUE**

1.  At all times relevant to this action, Plaintiff, is a corporation formed pursuant to the laws of the State of Washington with its principle place of business in Spokane County, Washington.

2.  Defendant, Lux Vending, LLC dba Bitcoin Depot, is a Georgia limited liability company and is registered as a foreign limited liability company under the laws of the State of Washington. Defendant does business in Spokane County, Washington.

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF- 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

3. The agreements purportedly entered into by and between Plaintiff and Defendant were entered into in Spokane, Washington, and all representations made by and negotiations involving the Parties occurred in Spokane County, Washington.

4. The Court has subject matter jurisdiction over this dispute.

## II.
## FACTUAL BACKGROUND

5. Plaintiff repeats and realleges every allegation contained in paragraphs 1-4 of this Complaint is if fully set forth herein.

6. Plaintiff was approached by representatives of Defendant in April of 2021 with Defendant seeking an agreement with Plaintiff to place Defendant's bitcoin automated teller machines in convenience stores owned and operated by Plaintiff.

7. In May 2021, Defendant's agent met with Plaintiff and presented Plaintiff with a document entitled Kiosk Site Location Agreement. Defendant represented that the Kiosk Site Location Agreement was the Agreement that governed the placement of the ATM in Plaintiff's store. See Kiosk Site Location Agreement dated 5/18/21 attached as Exhibit 1 to this Complaint.

8. Based upon the terms contained in the Kiosk Site Location Agreement, Plaintiff entered into the Agreement with Defendant for one of its stores located at 4615 N. Division St., Spokane, Washington by signing a Kiosk Placement Form on May 18, 2021. See executed Kiosk Placement Form dated 5/18/21 attached as Exhibit 2 to this Complaint.

COMPLAINT FOR FRAUD AND DECLARATORY
RELIEF- 2

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

9. At the time of the signing of the Kiosk Placement Form, Defendant represented to Plaintiff that the "Location Master Agreement" referred to in the Kiosk Placement Form was the Kiosk Site Location Agreement provided to him.

10. Paragraph 12 of the Kiosk Site Location Agreement provides that:

    "If the Location is sold or sells substantially all of its assets outside of the ordinary course of business, the Agreement will terminate and Location's obligations discharged so long as Location provides a document to Owner evidencing the sale such as a receipt, asset purchase agreement or bill of sale."

11. In October 2021, Plaintiff was again approached by Defendant seeking a second agreement to place one of Defendant's ATMs in another convenience store owned and operated by Plaintiff and located at 3812 E. Highland Rd., Mead, Washington.

12. As to this second ATM agreement proposed by Defendant, Plaintiff expressly asked and Defendant represented that the same terms governed this agreement as the Agreement entered into by the parties on 5/18/21.

13. Based upon Defendant's representations regarding the terms of the Agreement, Plaintiff signed another Kiosk Placement Form dated 10/29/21.  See Kiosk Placement Form dated 10/29/21 attached as Exhibit 3 to this Complaint.

14. Thereafter, in October 2022, Plaintiff entered into an agreement to sell the convenience stores where Defendant had placed its ATMs.

15. During the process of selling its stores, Plaintiff sent the required notice of the sale of the stores pursuant to the terms of the Agreement to Defendant to terminate the Agreement entered into by the Parties.

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF- 3

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

16. In response to Plaintiff's notice of termination of the Agreement, Defendant refused to allow the Agreement to be terminated citing provisions of an agreement that had never been provided to Plaintiff and which Plaintiff had never seen.  See Location Master Agreement terms attached hereto as Exhibit 4 to this Complaint.

17. Defendant then asserted that the terms of the new Location Master Agreement governed the relationship between the parties and refused to terminate the agreement.

18. Based on the terms of the new Location Master Agreement, Defendant also made a significant monetary demand to Plaintiff for payment of money Defendant expected to be paid based on the continued placement of the ATMs in Plaintiff's stores.

19. There was no meeting of the minds, mutual understanding of, or mutual assent to the materials terms of the Agreement the Parties purportedly entered into related to the placement of Defendant's ATMs in Plaintiff's stores.

20. A dispute has arisen between the Parties regarding the materials terms of the Agreement the Parties entered into related to the placement of Defendant's ATMs in Plaintiff's stores.

### III.
### FIRST CAUSE OF ACTION
### (Intentional Misrepresentation - Fraud)

21. Plaintiff repeats and realleges every allegation contained in paragraphs 1-20 of this Complaint is if fully set forth herein.

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF- 4

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

22. Defendant sought to obtain Plaintiff's agreement to place its ATMs in Plaintiff's stores, and to induce Plaintiff to agree to this, Defendant made material misrepresentations about the terms of the proposed agreement.

23. On or about May 18, 2021, Defendant approached Plaintiff about placing its ATM inside of Plaintiff's store.  To induce Plaintiff to enter into the Agreement, Defendant provided the Kiosk Site Location Agreement and represented that these were terms which governed the contract between the Parties regarding the placement of Defendant's ATM in Plaintiff's store.

24. The Kiosk Site Location Agreement allows for termination of the Agreement without penalty if Plaintiff's store is sold.  Plaintiff specifically relied on the terms of the Agreement as represented to it in deciding whether to enter into the Agreement.

25. On or about October 29, 2021, Defendant sought to obtain a second agreement from Plaintiff to place another of its ATMs in a second store owned by Plaintiff. Defendant induced Plaintiff to enter into the Agreement by expressly representing that the terms of the agreement for the second ATM placement were the same as those set forth in the May 18, 2021 Kiosk Site Location Agreement.

26. Over a year after Plaintiff executed the first Agreement, Defendant claimed that the Kiosk Site Location Agreement was not the Agreement Plaintiff had entered into and that a new Location Master Agreement governed the relationship between the Parties.  Defendant asserts that this new agreement did not allow a termination of the Agreement if the stores were sold, and Defendant made demand for all of the profits

COMPLAINT FOR FRAUD AND DECLARATORY
RELIEF- 5

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

it alleges it would have earned if the Agreement was in force for the entire term of the Agreement.

27. Defendant made intentional and fraudulent misrepresentations regarding the terms of the Agreement governing the placement of Defendant's ATMs in Plaintiff's stores to induce Plaintiff to enter into the agreements.

28. Defendant's intentional and fraudulent misrepresentations have caused Plaintiff significant damage.

29. Plaintiff has been forced to retain an attorney to address Defendants fraud by filing this action, and is entitled to its attorney's fees and costs expended in prosecuting this action.

### IV.
### <u>SECOND CAUSE OF ACTION</u>
### (Declaratory Relief)

30. Plaintiff repeats and realleges every allegations contained in paragraphs 1-29 of this Complaint is if fully set forth herein.

31. RCW 7.24, et seq. provides the Superior Court with the authority to declare rights, status and other legal relations under contracts and instruments. An active controversy exists as to the Parties' rights and interests under the Agreements that are the subject of this action.

32. Plaintiff seeks a declaratory ruling from this Court finding that the Agreements are invalid and unenforceable as there was no meeting of the minds regarding the terms of the Agreements that is required to form an agreement between the Parties.

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF- 6

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

33. Plaintiff has been forced to retain an attorney to address Defendant's fraud by filing this action, and is entitled to its attorney's fees and costs expended in prosecuting this action

## V.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For a judgment in favor of Plaintiff declaring any alleged Agreement between the Parties invalid and unenforceable;

2. Compensatory damages for the fraud committed by Defendant;

3. Punitive damages against Defendant for the fraud committed by Defendant;

4. For prejudgment interest and post judgment interest as provided by applicable law;

5. For attorney's fees and costs as provided under by Agreement and pursuant to Washington law;

6. For such other and further relief as the Court may deem just and proper.

DATED this _17th_ day of January, 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By: _____
MICHAEL R. MERRITT, WSBA #60094
Counsel for Plaintiff

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF- 7

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

# EXHIBIT 1

**Kiosk Site Location Agreement**

This Kiosk Site Location Agreement (the "Agreement") is made and entered into effect _5-18-2021_ (the "Effective Date") by and between Lux Vending, LLC ("Owner"), and _NonThTown ChevRon_ ("Location")

1. **Equipment:** Owner owns kiosks that facilitate the purchase and sale of virtual currency and owns or has the right to use all software needed for the operation of the kiosk (the "Kiosk"). Location agrees that Owner may install, operate, and maintain its Kiosk at Location's premises identified in Exhibit "1" attached hereto (the "Premises"). The Kiosk will be installed in an indoor, mutually agreeable location on the Premises. The Kiosk will be installed to provide an unrestricted view of the Kiosk with room for signage. Location will provide sufficient space for the Kiosk as is necessary to enable customers to have unobstructed access to the Kiosk and for maintenance and servicing of the Kiosk.

2. **Availability:** Location agrees that the Kiosk shall at all times remain available for use by Location's customers during Location's normal business hours for the Term (defined below) of this Agreement. Owner reserves the right to schedule reasonable downtime to accomplish necessary maintenance or system improvements.

3. **Location Fees:** Once the Kiosk has been installed on the Premises and is fully operational for use by the public, Owner shall pay Location a fee equal to _One Hundred Fifty_ dollars and zero cents ($_150.00_) per month throughout the Term or _One Dollan Fifty_ ($_1.50_) per transaction (the "Location Fee"). Whichever of the two payments is greater will be disbursed to the Location. For purposes of this Agreement, a transaction is defined as any sale of virtual currency where a transaction fee is collected by the Owner. The Location Fee will be disbursed monthly by Owner to Location the calendar month following the calendar month in which the Kiosk transactions occurred.

4. **Title:** Title to the Kiosk is, and shall at all times remain with the Owner. The Kiosk shall not be transferred or delivered legally or physically to any person other than Owner without prior written consent of Owner; neither shall this Agreement nor the bailment be assigned by Location, either by its own acts or by operation of law. In the event that any creditor of Location enters the Premises for the purpose of taking possession of Location's separate property pursuant to a security agreement, Writ of Possession, Distress Warrant or Writ of Fieri Facias, Location shall identify, designate, and exclude the Kiosk as Owner's property not subject to repossession or execution. Location shall promptly notify Owner in writing of any attempts by any creditor, landlord or third-party claimants seeking to repossess Location's separate property or seeking to execute a Writ of Possession, Distress Warrant or Writ of Fieri Facias at the Premises. Upon Owner's request, Location shall further identify any such creditors, landlords or third-party claimants to Owner. Upon request, Location shall execute and deliver documentation to put third parties on notice of Owner's ownership of the Kiosk. Notwithstanding Section 5 herein, Location acknowledges that the Kiosk is not a fixture of the Premises and Location shall undertake all necessary steps to ensure that the Kiosk does not become a fixture of the Premises. Except as otherwise provided in this Agreement, all cash kept in the Kiosk shall be the property of Owner.

1

5. **Installation/Training:** Owner agrees to ship and install the Kiosk at the Premises, train Location's staff as necessary, and deliver initial supplies to Location. Subject to the terms and provisions of Section 4 herein, Owner shall have the right to bolt down the Kiosk and install appropriate signage at the Premises to advertise the availability of the Kiosk.

6. **Maintenance/Repair:** Owner, at its expense, will arrange for necessary servicing and repair of the Kiosk. In the event of any Kiosk failure, damage, or other problem requiring repair, replacement, adjustment, or maintenance, Location shall notify Owner, or a person designated by Owner, within twenty-four (24) hours of first becoming aware of such failure, damage, or problem. Location will not permit anyone, other than an authorized representative or designee of Owner, to perform any service or repair work on the Kiosk without Owner's prior written approval. Owner or its representatives shall, at any reasonable time and at all times during business hours, have the right to enter into and upon the Premises for the purpose of inspecting, repairing, maintaining, or upgrading the Kiosk and observing its use. Location shall cooperate in allowing Owner to perform maintenance, service, updates, or repairs that can be performed by remote communication. Owner, or Owner's agents, shall replace paper in the Kiosk when necessary and shall correct any misfeeds. Location shall maintain the space surrounding the Kiosk in a safe, neat, and orderly condition.

7. **Inventory Requirements:** Owner or Owner's agents shall maintain inventory of an adequate supply of paper and Bitcoin for the Kiosk. Owner shall keep sufficient amounts of cash in the Kiosk at all times during Location's normal business hours if the Kiosk dispenses cash.

8. **Internet & Electrical Requirements:** Location can choose to provide and maintain a dedicated business Ethernet or Wi-Fi connection for the Kiosk or Location may require the Owner to provide a wireless connection for the Kiosk. Location shall, at its expense, provide one (1) dedicated operating electrical power outlet (110v). Both the internet connection and the electrical power outlet shall be located within two (2) feet of the Kiosk site, or an extension cord shall be provided by Location. Location shall pay for all expenses incurred for an internet connection if Location provides an ethernet connection for the Kiosk. Location shall pay for all expenses incurred in connection with electrical power usage necessary to operate the Kiosk and related signage. Location shall not interfere with the Kiosk's electrical or internet connectivity for duration of the Agreement and Location shall not disconnect or deactivate the Kiosk or allow the Kiosk to be disconnected or deactivated. If the Kiosk remains disconnected or deactivated after Owner provides written notice, Owner will be excused from paying the Location Fee for so long as the Kiosk remains disconnected or deactivated and Location shall be liable to Owner for a "Disconnection Fee" in the amount of One Hundred ($100.00) for each day the Kiosk remains disconnected or deactivated. The Parties acknowledge and agree that the Disconnection Fee is not a penalty but is instead intended to be liquidated damages. The Parties agree and acknowledge that Owner's damages would be difficult to estimate upon disconnection or deactivation of the Kiosk but that One Hundred Dollars per day ($100.00) is a reasonable method of calculating Owner's damages and the Parties agree that this

2

provision should be read as liquidated damages rather than a penalty. Location's liability for the Disconnection Fee will continue during the Term for so long as the Kiosk remains disconnected or deactivated. Owner may retrieve the Kiosk for purposes of safe keeping, but Owner's acceptance of the Kiosk will not discharge Location of its obligation to pay the Disconnection Fee. Location agrees to pay Owner's reasonable attorney's fees and expenses of litigation in the event Owner engages counsel to collect the Disconnection Fee. Notwithstanding the foregoing, the Disconnection Fee shall not apply to interference directly resulting from power outages beyond the reasonable control of the Location and/or an agent or party acting on behalf of the Location.

9. **Exclusivity; Competitors:**

9.1    Location shall not permit the removal of the Kiosk from the Premises for the duration of the Term.

9.2    Location shall not enter into an agreement with any Competitor or allow the placement of a Competitor's kiosk on the Premises (whether inside or outside the Premises) or anywhere on the underlying real property on which the Premises are located, nor subscribe to any processing service for the purchase or sale of virtual currency on the Premises that may compete with the Owner's Kiosk during the term of this Agreement. For purposes of this Agreement, "Competitor" means any person or entity that trades virtual currency; owns or operates digital currency kiosks; or conducts, authorizes, offers or provides services and products of the type conducted, authorized, offered or provided by Bitcoin Depot during the term of this Agreement or any person or entity that facilitates the purchase or sale of digital currency.

9.3    Location agrees that Owner shall have the exclusive right to provide digital currency kiosks or any terminal that can conduct and/or execute digital currency transactions to Location and to all other business sites occupied (including by way of ownership, lease or sublease) by Location.

9.4    If Location violates this Agreement by entering into an agreement with a Competitor and fails to cure such violation within ten (10) days after receipt of Owner's notice of the violation, Owner shall have all remedies provided by law.

9.5    Location's obligations under this Section 9 have been assumed as an accommodation to Owner and as a material inducement to Owner to enter into this Agreement. Any breach of Location's obligations under this Section 9 shall be deemed a material breach of this Agreement. The Parties agree that Location's breach of this exclusivity agreement would cause irreparable damage to Owner and monetary damages would provide inadequate remedy to Owner. Owner will be entitled to seek temporary and permanent injunctive relief to prohibit additional violations of this exclusivity agreement in addition to seeking any award of damages for such violation.

3

10. **Protection Requirements:** Location shall exercise due care for the safekeeping and maintenance of the Kiosk. Location shall not be held liable for damage, theft or loss of the Kiosk except in cases of fraud, gross negligence, or intentional malfeasance by the Location. Owner shall have no liability to Location in the event of theft, damage or loss caused by the Kiosk.

11. **Ownership of Premises or Lease Term(s):** Location represents and warrants that it is the owner of the Premises or that it holds a lease or option to renew a lease of the Premises of equal or greater length than the Initial Term (as defined below) of this Agreement. If Location leases the premises, the Location shall notify Owner of any dispossessory or distress proceedings initiated against Location or the Premises within twenty-four (24) hours of being served with process of the dispossessory or distress proceedings. In the event that dispossessory or distress proceedings are initiated against Location, Owner has the right to terminate this Agreement and reclaim possession of the Kiosk.

12. **Relocation; Sale; Expansion:** In the event Location transfers or moves its business from the Premises, expands its business to additional sites, or if Location sells its business or substantially all of its assets, Location shall provide Owner with at least sixty (60) days' advance written notice of such occurrence (or as much notice as reasonably practicable) ("Location's Notice"). Owner shall have the exclusive option to install an additional Kiosk at the Location's (or its successor in interest's) new business site(s) along the same terms and conditions set forth in this Agreement (the "Option"); and Owner may exercise its Option by delivering written notice of its intent to exercise its Option within thirty (30) days from its receipt of Location's Notice. Location agrees that, in the event of transfer, move or sale of Location's business, this Agreement remains in full force and effect as to the Location's new business site(s) and Exhibit **"1"** shall be deemed amended so that the Premises shall include the Location's new business site(s). If the Location is sold or sells substantially all of its assets outside the ordinary course of business, this Agreement will terminate and Location's obligations discharged so long as Location provides a document to Owner evidencing the sale such as a receipt, asset purchase agreement or bill of sale.

13. **Term:** This Agreement shall be for a term of *seven* (7) years from the date of installation of the Kiosk at the Premises, unless amended or terminated by written agreement signed by both Owner and Location, or terminated as set forth below (the "Initial Term"). Upon the expiration of the Initial Term, this Agreement will automatically renew for subsequent additional terms of *seven* (7) years each on the same terms and conditions as provided herein unless canceled by written notice at least ninety (90) days prior to expiration of the then current term (the Initial Term, as extended, the "Term").

14. **Termination:** Upon the occurrence of a breach, either party may terminate this Agreement effective ten (10) days after giving written notice of intent to terminate, provided that such breach continues for ten (10) days after notice of such breach. Either party may terminate this Agreement in accordance with the terms and provisions of Section 13. In addition, Owner may terminate this Agreement upon giving thirty (30) days prior written notice to Location. Owner has the right to terminate this Agreement immediately in the event of damage, destruction, vandalism, misuse, loss, or the Owner, in good faith, believes that the

4

Kiosk is at risk for damage, destruction, vandalism, misuse or loss. Even if the Agreement is terminated, Location's obligation to pay a Disconnection Fee shall survive for the duration of the length of the Term. In the event the Agreement is terminated, Owner may declare all Disconnection Fees due for the length of the Term immediately due and payable so long as the Owner discounts the future Disconnection Fees to a net present value using the Wall Street Journal's Prime Rate.

All notices hereunder shall be in writing and shall be deemed given upon personal delivery or upon deposit in the United States certified mail, return receipt requested, with postage paid or by overnight receipted courier service, addressed to Owner and Location at their respective addresses as listed below. Any party may change its address for notice in accordance with the terms of this paragraph.

15. **Disclaimer:** EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, LOCATION UNDERSTANDS AND AGREES THAT OWNER MAKES NO WARRANTY, EXPRESS, IMPLIED, OR STATUTORY AS TO ANY MATTER WHATSOEVER, INCLUDING THE CONDITION OF THE KIOSK, ITS MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. OWNER SHALL IN NO EVENT BE RESPONSIBLE FOR ANY LOST PROFITS OR INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR INDIRECT DAMAGES THAT LOCATION MAY INCUR. OWNER'S SOLE LIABILITY TO LOCATION HEREUNDER, EXCEPT AS OTHERWISE PROVIDED, SHALL BE TO REMEDY ANY BREACH OF THIS AGREEMENT IN A TIMELY MANNER. NEITHER PARTY WILL BE LIABLE FOR FAILURE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT IF SUCH FAILURE IS DUE TO ACTS OR EVENTS BEYOND SUCH PARTY'S REASONABLE CONTROL.

16. **Not Assignable:** Location shall not assign or dispose of any of its rights or obligations under this agreement without prior written consent of Owner. This agreement is binding on the successors and permitted assigns of the parties.

17. **Waiver:** A waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of that party's rights to otherwise demand strict compliance with this Agreement and any and all provisions hereof.

18. **Arbitration:** Except as specified in this Section 18, any dispute, controversy, or claim arising out of or relating to this Agreement or the breach, termination or validity of this Agreement will be submitted to arbitration as prescribed herein. The parties will agree on a single arbitrator within thirty (30) days of receipt of a notice of intent to arbitrate. Such arbitrator will be knowledgeable about the ATM industry and will conduct the arbitration under the current Commercial Arbitration rules of the American Arbitration Association ("AAA"), unless otherwise provided herein. The arbitrator will be selected in accordance with AAA procedures from a list of qualified people maintained by AAA. The arbitration will be conducted in Atlanta, Georgia. The arbitrator's decision and award will be final and binding, and judgement upon the award rendered by the arbitrator may be entered in any

court having jurisdiction thereon. Any duty to arbitrate under this Agreement will remain in effect and enforceable after termination of this Agreement for any reason.

19. **Entire Agreement:** This Agreement, including any schedule or exhibit attached hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof. There are no other promises, representations, terms, conditions, or obligations other than those contained herein. This agreement supersedes all prior communications, representations or agreements, oral or written, between the parties and shall not be modified except in writing signed by both parties.

20. **Controlling Law:** This Agreement shall be construed, interpreted, and enforced in accordance with the laws of the State of Georgia, without regard to its conflict of law principles. The jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in Fulton County, Georgia or any county where Owner (or its successor in interest) maintains its principal place of business or residence.

21. **Counterparts:** This Agreement may be executed in counterparts and exchanged via email transmission. Each email transmitted counterpart (including pdf) bearing a signature shall be an original for all purposes and all such counterparts shall constitute one and the same agreement.

22. **Third-Party Beneficiaries.** There shall be no Third-Party Beneficiaries to this agreement.

# EXHIBIT 2

# Kiosk Placement Form

| | |
|---|---|
| Location Legal Entity:<br>DDD, INC. | Effective Date:<br>5-18-2021 |
| Location DBA Name: Northtown Chevron | Pacific distributing |
| Phone: 509-489-9039 | Distributor Name (Entity and DBA): |
| Email: bdive1@msn.com | Phone: 1-800-548-1913 |
| Address to be used for payment:<br>4615 N. Division St<br>Spokane, WA. 99207 | Email: pacificdistributing.86@<br>Sales Contact: gmail.com<br>Mark Smith 770 670 9095<br>mark@bitcoindepot.com |
| Tenant or Landlord? Tenant | |
| If Tenant, lease end date: 12/31/2039 | |
| Term: 7-Years | |

| Premises<br>[Put full address of store] | Additional Entity<br>(if applicable) | Per Trans.<br>Fee | Flat Fee: |
|---|---|---|---|
| 4615 North Division<br>Spokane, WA<br>99207 | | 1.50 | 150.00 |
| | | | |
| | | | |

By signing below, Location and Bitcoin Depot expressly agree to be bound by all of the terms and conditions of the Location Master Agreement located at get.bitcoindepot.com/LMA or such other URL or address as provided by Bitcoin Depot from time to time ("LMA"), which is hereby incorporated by reference. Capitalized terms shall have the meaning set forth in the LMA. Location acknowledges and agrees that it has read and understands the terms set forth in the LMA and that all information in this Kiosk Placement Form is accurate and complete.

Owner:

Signed: *Landon Thomas*

Lux Vending, LLC d/b/a Bitcoin Depot
2870 Peachtree Rd #327
Atlanta, Georgia, 30305

Name: _____ Landon Thomas

Location:

Signed: X _____

5/9/1

Name: Robert A. Divelbiss

Title: President

Address: 40303 NorthShore Dr.
Loon Lake, WA. 99148

CN: 2320017632

SN: 8

PC: 2

2

3    2023 JAN 31  P 2: 53

4    TIMOTHY W. FITZGERALD
     SPOKANE COUNTY CLERK

5

6

7

**FILED**

**JAN 31 2023**

Timothy W. Fitzgerald
**SPOKANE COUNTY CLERK**

8    IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

9    IN AND FOR THE COUNTY OF SPOKANE

10

11   DDD, INC., a Washington corporation,

12              Plaintiff,

13        v.

14   LUX VENDING, LLC D/B/A BITCOIN
15   DEPOT, a foreign limited liability company,

16              Defendant.

No.  23-2-00176-32

DECLARATION OF SERVICE OF
PROCESS

17        See attached Declaration of Service.

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SERVICE
OF PROCESS   - 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF SPOKANE

DDD, Inc.

           Plaintiff(s):

vs.

Lux Vending, LLC d/b/a BitCoin Depot

           Defendant(s):

**DECLARATION OF SERVICE**

Case Number: 23200176-32

For:
Hawley Troxell Ennis & Hawley LLP - Spokane
422 W. Riverside Ave., Ste. 1100
Spokane, WA 99201

Received by Tri-County Process Serving LLC on January 19, 2023 to be served on **LUX VENDING, LLC D/B/A BITCOIN DEPOT**.

**I, Antonio Roque, state that on Thursday, January 19, 2023, at 2:35 PM**, I served the within named **Lux Vending, LLC d/b/a BitCoin Depot** by delivering a true copy of the **Summons; Complaint for Fraud and Declaratory Relief; Case Assignment Notice and Order; Spokane County Clerk Indexing Sheet** to Hailee Ackerman of Corporation Service Company, Registered Agent for Lux Vending, LLC d/b/a BitCoin Depot, a person authorized to accept service on behalf of Lux Vending, LLC d/b/a BitCoin Depot. Said service was effected at **1305 12th Ave. Rd., Nampa, ID 83686**.

Approximate description of Hailee Ackerman
  Female  25 years old,  5' 6" Tall,  135 lbs,  Brown Hair,  Green  eyes.

I hereby acknowledge that I am a Process Server in the county in which service was effected. I am over the age of eighteen years and not a party to the action. I declare under penalty of perjury pursuant to the law of the State of Idaho that the foregoing is true and correct.

Our Reference Number: 200446
Client Reference: Michael R. Merritt

Wednesday, January 25, 2023

**TRI-COUNTY PROCESS SERVING LLC**
P.O. Box 1224
Boise, ID, 83701
(208) 344-4132

**ANTONIO ROQUE**

CN: 2320017632

**SN: 4**

PC: 45

FILED

JAN 31 2023

Timothy W. Fitzgerald
SPOKANE COUNTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

| | |
|---|---|
| DDD, INC., a Washington corporation, | |
|                Plaintiff, | **NO. 23-2-00176-32** |
| v. | **DECLARATION OF ROBERT DIVELBISS** |
| LUX  VENDING, LLC D/B/A BITCOIN DEPOT, a foreign limited liability company, | |
|                Defendant. | |

I, Robert Divelbiss, state and declare as follows:

1.  I am over 18 years old, I am the President of DDD, Inc. ("DDD"), I am competent to testify, and make this declaration based on personal knowledge.

2.  I was contacted by Glen Coulter, an agent of Lux Vending, LLC dba Bitcoin Depot ("Bitcoin"), in April 2021. Mr. Coulter spoke to me about what he called a great deal for increasing foot traffic in DDD's convenience store locations by placing bitcoin ATMs in DDD's stores.  I had dealt with Mr. Coulter for many years in the past, and I trusted him.  As such, I agreed to meet with him to discuss the proposal.

Declaration of Robert Divelbiss
- 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

3. Mr. Coulter presented a deal in a telephone conference whereby DDD would allow Bitcoin to place one of its automated teller machines in one of DDD's stores. I was told that DDD would be paid rent for the placement of the machine in the store. In our discussion, Mr. Coulter also outlined the basic terms of the deal and we agreed to meet again at another time to discuss it.

4. Based upon information and belief, I met Glen Coulter again on 5/18/21. In that meeting, he told me bitcoin ATMs were in great demand, and he showed me a brochure on the machines, which promised a free machine, free setup of the machine, no maintenance, and a boost in foot traffic in DDD's stores. Additionally, DDD would be paid rent buy Bitcoin for the placement of the machine in the store. The basic rent payment terms were explained to me and I was provided with a document entitled Kiosk Site Location Agreement to review. Mr. Coulter represented that the Kiosk Site Location Agreement was the agreement that governed the relationship of the parties with respect to the placement of the ATM machines in DDD's stores. A true and correct copy of the Kiosk Site Location Agreement that was provided to me by Glen Coulter is attached hereto as Exhibit 1.

5. I reviewed the terms of the Kiosk Site Location Agreement thoroughly and specifically noted the term in paragraph 12 of the agreement which allowed the agreement to be terminated, with no penalty, if DDD decided to sell one of its stores where a Bitcoin ATM had been placed. At that time, in May 2021, DDD was

considering selling all of its stores within the next 2-3 years; as such, this term in the agreement was material to DDD's decision to enter into the agreement.

6. After reviewing the terms of the Kiosk Site Location Agreement, DDD agreed to enter into an agreement for the placement of an ATM in one of its stores. I was directed by Glen Coulter to sign a Kiosk Placement Form, as President of DDD, which memorialized the agreement of the parties. The Kiosk Placement Form referred to a "Location Master Agreement", which Mr. Coulter represented was the Kiosk Site Location Agreement. The ATM was installed at DDD's store located at 4615 N. Division St., Spokane, Washington. See a true and correct copy of the Kiosk Placement Form signed on 5/18/21 is attached hereto as Exhibit 2.

7. On 10/29/21, I was again approached by Glen Coulter for the placement of a second ATM at another of DDD's stores. I suggested that the ATM be placed at DDD's Deer Park location, but Mr. Coulter stated that Bitcoin would only allow the machines to be placed in major metropolitan areas, so we settled on placing it in DDD's Mead location. I asked Mr. Coulter whether the same agreement terms governed the placement of the second ATM machine, and he expressly represented that the agreement, which governed the placement of the ATM at the Mead store would be the same as the Kiosk Site Location Agreement provided to me previously by Mr. Coulter in May 2021. Based on this representation, I signed a second Kiosk Placement Form as President of DDD. The ATM was installed at 3812 E. Highland

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

Rd., Mead, Washington.  See true and correct copy of Kiosk Placement Form dated 10/29/21 is attached hereto as Exhibit 3.

8. DDD began discussing a possible sale of DDD's stores in October 2021. Negotiations began in earnest in late September 2022.  Part of the negotiations involved the various contracts and termination fees related to the agreements, which had to be considered as part of the sale. As part of the sale negotiation, the buyers were making $200,000 available to DDD to pay for contract termination fees that would be asserted by DDD's various vendors.  Accordingly, as part of DDD's due diligence in preparing for the closing of the sale, I began making contact with its vendors to assess and determine the nature and extent of all of the fees that would need to be paid due to the termination of various agreements incident to the sale of the stores.  As part of this process, one of my first calls was to Glen Coulter related to the Bitcoin ATM agreements. Mr. Coulter directed me to get in contact with Mark Smith, Business Development Manager at Bitcoin, to discuss the fees.

9. When I contacted Mark Smith, he first urged me to try and obtain an agreement from the new owners to assume the ATM contracts, but assured me that if this could not be accomplished there would be no fees related to the termination.  Mr. Smith expressly represented to me during our telephone call that there would be no termination fees or costs associated with the termination of the contracts incident to the sale of the stores.  He stated that there would be a 2 year non-compete clause, which would have to be complied with, and that Bitcoin would need two week notice to remove the machines from the store.

Declaration of Robert Divelbiss - 4

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

10. On 10/3/22, I emailed Mark Smith on behalf of DDD, reminding him of our recent telephone conversation and asking about the nature and extent of the paperwork that would need to be completed to terminate the agreement and remove the ATMs from the stores. Mr. Smith responded by sending me copies of the two kiosk placement forms that I had signed on behalf of DDD, and stated that he would need documentation which verified that the sale of the stores had occurred and asked that I do my best to represent the product to the new owner. See true and correct copy of e-mail exchange dated 10/3/22 attached hereto as Exhibit 4.

11. The new owner informed DDD that it did not wish to continue the agreement with Bitcoin after it took ownership of the stores. On 10/11/22, I sent another e-mail to Mark Smith informing him that the new owner did not want to continue the agreement with Bitcoin, and reminding him that he had agreed to a terminate the agreement on behalf of Bitcoin with no termination fees or penalties. I also informed Mr. Smith that DDD had entered into a formal purchase agreement with the new owners on 10/7/22 and that the sale was scheduled to close on 12/1/22. See true and correct copy of 10/11/22 e-mail correspondence to Mark Smith attached hereto as Exhibit 5.

12. In response to the 10/11/22 e-mail correspondence, Mr. Smith thanked me for communicating the information and stated that he would have the appropriate Bitcoin team "take it from here." See true and correct copy of e-mail correspondence from Mr. Smith dated 10/11/22 attached hereto as Exhibit 6: see also true and correct

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

copy of email from Mark Smith to Bitcoin team to remove ATMs date 10/11/22 attached hereto as Exhibit 7.

13. Thereafter on 11/15/22, I received written confirmation from Kristin Fetter of Bitcoin that they had a "move ticket" in their system scheduling the ATM removal for the North Division store on 11/22/22 and that she would keep me posted regarding the Mead store. See true and correct copy of 11/15/22 e-mail correspondence from Kristin Fetter attached hereto as Exhibit 8.

14. On 11/15/22, at Mark Smith's request, I sent e-mail correspondence to Mr. Smith attaching the letter of intent to purchase DDD's stores set by the new owner to verify the sale.

15. On 11/18/22, Glen Coulter informed me that Bitcoin intended to charge DDD termination fees related to the sale of the business. This is the first I had heard of this after my many communications with Bitcoin representatives.

16. On the same day, 11/18/22, I inquired of Mark Smith by e-mail about Bitcoin's new revised position related to termination fees. I reminded Mr. Smith that in late September I had spoken to him about my wife's cancer diagnosis and my decision to retire somewhat early with DDD selling its stores. I reminded him again of his representation that no termination fees would be charged and asked him why Glen Coulter was now asserting that DDD would be charged termination fees. See true and correct copy of 11/18/22 e-mail correspondence attached hereto as Exhibit 9.

Declaration of Robert Divelbiss
- 6

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

17. On 11/21/22 Mr. Smith sent an e-mail correspondence to me reaffirming that there would be no termination fees related to the sale of the stores. He also related that there were circumstances where early removal of the machines from a location could incur penalties, but only in the instance where the owners of the location are terminating the agreement with Bitcoin under false pretenses just to enter into an agreement with another Bitcoin partner. Mr. Smith stated that because this was not occurring here, the only thing for Bitcoin to do was to pick the ATMs up and thank DDD for hosting the machines during its ownership of the locations. See true and correct copy of 11/21/22 correspondence from Mark Smith attached hereto as Exhibit 10.

18. On 11/28/22 I sent a further e-mail correspondence to Mark Smith informing him that the ATMs had not yet been removed from the stores, and that the new owners took ownership of the stores in two days. I further informed Mr. Smith that after the sale closed, DDD could not be held responsible for the ATMs if they had not been removed. I asked him to confirm that the ATMs were being removed. See true and correct copy of 11/28/22 e-mail correspondence sent to Mark Smith attached hereto as Exhibit 11.

19. In response to my 11/28/22 e-mail, Kristin Fetter replied asking if the addresses that she had for the stores were correct. In response, I assured her that the addresses were correct and that the machines needed to be removed from the stores by December

Declaration of Robert Divelbiss - 7

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

1st. Ms. Fetter assured me that she would pass that information along and express urgency to those charged with the responsibility of removing the machines. See true and correct copy of 11/28/22 e-mail exchange with Kristin Fetter attached hereto as Exhibit 12.

20. On 11/29/22, I received e-mail correspondence from Ms. Fetter informing me that I would be receiving a demand letter from Bitcoin related to the removal of the machines. See true and correct copy of 11/29/22 e-mail from Kristin Fetter attached hereto as Exhibit 13.

21. I then sent e-mail correspondence to Mark Smith on the same day asking him what a demand letter was and asked why I would be receiving one. He replied that he had just learned that day that a demand letter would be sent. He further informed me that he understood that DDD had done all it could to obtain an agreement with the new owners to continue hosting the machines in the store locations, and that the demand letter was a "formal procedure" that must be sent in "these situations." He further stated that the matter was under review since DDD had been so upfront and forthright through the entire process. See true and correct copy of e-mail exchange with Mark Smith attached hereto as Exhibit 14.

22. On 11/30/22, I received an e-mail from Mark Smith informing me that Bitcoin's legal department had taken issue with the termination of the agreements since Bitcoin had done so well, with respect to profit, with the placement of the ATMs in DDD's stores. Mr. Smith informed me that the new owners "should be taking over these contracts to avoid us taking action", and that the new owners should allow the

contracts to run the full term before they attempted to replace Bitcoin. I was urged to "try to make this happen." Mr. Smith then informed me that he had done all he could up to that point, but because of the huge financial loss involved for Bitcoin by the early termination, Bitcoin would not be treating the situation as a simple request to remove the machines from the store locations. Bitcoin was clearly taking this position in an effort to leverage the new owner's continued participation in the agreements even though they had no contractual right to do so. See true and correct copy of 11/30/22 e-mail correspondence with Mark Smith attached hereto as Exhibit 15.

23. I responded to Mr. Smith's email by reminding him that he had more than once affirmed that there would be no termination fees pursuant to the agreement DDD had entered into with Bitcoin. In response to this, Mr. Smith sent e-mail correspondence on 12/1/22 with a link to a new "Location Master Agreement" that I had never before seen. In this correspondence, Mr. Smith asserts the termination fees will apply according to the new Location Master Agreement attached to the e-mail. Mr. Smith further asserts that in the typical sale of a store the new buyers "should absorb" all of the existing vendor contracts that are still in place and that if this does not occur, the original owner is held accountable. He then says again that because Bitcoin did so well with the machines in DDD's stores, there is significant loss to Bitcoin, and therefore the fees must be assessed against DDD. See true and correct copy of e-mail exchange attached hereto as Exhibit 15.

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

24. I discussed the Bitcoin ATM agreements with the new owners of the stores, and I was informed by the new owners that hosting bitcoin ATMs in their stores was not part of their business plan, and that they did not host any bitcoin ATMs in any of their stores.

25. I found Bitcoin's demand letter to DDD in my junk e-mail folder on 12/3/22. In the letter, Bitcoin seeks payment of termination fees due to the sale of the stores. Thereafter, Bitcoin removed the ATM from the Division Street store and to date, never took any action to remove the ATM from the Mead store.

26. It was not until after the closing of the sale of the stores that Bitcoin made its demand to DDD for termination fees. Because DDD did not know that Bitcoin intended to demand termination fees until after the sale of DDD's stores closed, the burden of the payment of the fees was not accounted for in the sale price of the stores. Also no amount of the $200,000 allocated as part of the sale agreement for payment of termination fees was set aside for any fees charged by Bitcoin. As such, any fees Bitcoin should demand at this point would be damage or financial loss to DDD caused by Bitcoin.

Declarant makes this declaration under penalty of perjury and pursuant to the laws of the State of Washington.

DATED this _18th_ day of January, 2023.

_____
Robert Divelbiss, President
DDD, Inc.

Declaration of Robert Divelbiss
- 10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 31st day of January, 2023, the foregoing was delivered to the following persons in manner indicated:

David F. Ellison                    ☐ By Hand Delivery
Fortson, Bentley, and Griffin, P.A. ☒ By U.S. Mail
Attorneys at Law                    ☐ By Overnight Mail
2500 Daniell's Bridge Road          ☐ By Facsimile
Building 200, Suite 3A              ☒ By Electronic Mail:
Athens, GA 30606

Mary Newlin, Legal Assistant

Declaration of Robert Divelbiss
- 11

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

# EXHIBIT 1

**Kiosk Site Location Agreement**

This Kiosk Site Location Agreement (the "Agreement") is made and entered into effect 5-18-2021 (the "Effective Date") by and between Lux Vending, LLC ("Owner"), and _North Town Chevron_ ("Location")

1.  **Equipment:** Owner owns kiosks that facilitate the purchase and sale of virtual currency and owns or has the right to use all software needed for the operation of the kiosk (the "Kiosk"). Location agrees that Owner may install, operate, and maintain its Kiosk at Location's premises identified in Exhibit "1" attached hereto (the "Premises"). The Kiosk will be installed in an indoor, mutually agreeable location on the Premises. The Kiosk will be installed to provide an unrestricted view of the Kiosk with room for signage. Location will provide sufficient space for the Kiosk as is necessary to enable customers to have unobstructed access to the Kiosk and for maintenance and servicing of the Kiosk.

2.  **Availability:** Location agrees that the Kiosk shall at all times remain available for use by Location's customers during Location's normal business hours for the Term (defined below) of this Agreement. Owner reserves the right to schedule reasonable downtime to accomplish necessary maintenance or system improvements.

3.  **Location Fees:** Once the Kiosk has been installed on the Premises and is fully operational for use by the public, Owner shall pay Location a fee equal to One Hundred Fifty dollars and zero cents ($150.00) per month throughout the Term or One Dollar Fifty ($1.50) per transaction (the "Location Fee"). Whichever of the two payments is greater will be disbursed to the Location. For purposes of this Agreement, a transaction is defined as any sale of virtual currency where a transaction fee is collected by the Owner. The Location Fee will be disbursed monthly by Owner to Location the calendar month following the calendar month in which the Kiosk transactions occurred.

4.  **Title:** Title to the Kiosk is, and shall at all times remain with the Owner. The Kiosk shall not be transferred or delivered legally or physically to any person other than Owner without prior written consent of Owner; neither shall this Agreement nor the bailment be assigned by Location, either by its own acts or by operation of law. In the event that any creditor of Location enters the Premises for the purpose of taking possession of Location's separate property pursuant to a security agreement, Writ of Possession, Distress Warrant or Writ of Fieri Facias, Location shall identify, designate, and exclude the Kiosk as Owner's property not subject to repossession or execution. Location shall promptly notify Owner in writing of any attempts by any creditor, landlord or third-party claimants seeking to repossess Location's separate property or seeking to execute a Writ of Possession, Distress Warrant or Writ of Fieri Facias at the Premises. Upon Owner's request, Location shall further identify any such creditors, landlords or third-party claimants to Owner. Upon request, Location shall execute and deliver documentation to put third parties on notice of Owner's ownership of the Kiosk. Notwithstanding Section 5 herein, Location acknowledges that the Kiosk is not a fixture of the Premises and Location shall undertake all necessary steps to ensure that the Kiosk does not become a fixture of the Premises. Except as otherwise provided in this Agreement, all cash kept in the Kiosk shall be the property of Owner.

1

5. **Installation/Training:** Owner agrees to ship and install the Kiosk at the Premises, train Location's staff as necessary, and deliver initial supplies to Location. Subject to the terms and provisions of Section 4 herein, Owner shall have the right to bolt down the Kiosk and install appropriate signage at the Premises to advertise the availability of the Kiosk.

6. **Maintenance/Repair:** Owner, at its expense, will arrange for necessary servicing and repair of the Kiosk. In the event of any Kiosk failure, damage, or other problem requiring repair, replacement, adjustment, or maintenance, Location shall notify Owner, or a person designated by Owner, within twenty-four (24) hours of first becoming aware of such failure, damage, or problem. Location will not permit anyone, other than an authorized representative or designee of Owner, to perform any service or repair work on the Kiosk without Owner's prior written approval. Owner or its representatives shall, at any reasonable time and at all times during business hours, have the right to enter into and upon the Premises for the purpose of inspecting, repairing, maintaining, or upgrading the Kiosk and observing its use. Location shall cooperate in allowing Owner to perform maintenance, service, updates, or repairs that can be performed by remote communication. Owner, or Owner's agents, shall replace paper in the Kiosk when necessary and shall correct any misfeeds. Location shall maintain the space surrounding the Kiosk in a safe, neat, and orderly condition.

7. **Inventory Requirements:** Owner or Owner's agents shall maintain inventory of an adequate supply of paper and Bitcoin for the Kiosk. Owner shall keep sufficient amounts of cash in the Kiosk at all times during Location's normal business hours if the Kiosk dispenses cash.

8. **Internet & Electrical Requirements:** Location can choose to provide and maintain a dedicated business Ethernet or Wi-Fi connection for the Kiosk or Location may require the Owner to provide a wireless connection for the Kiosk. Location shall, at its expense, provide one (1) dedicated operating electrical power outlet (110v). Both the internet connection and the electrical power outlet shall be located within two (2) feet of the Kiosk site, or an extension cord shall be provided by Location. Location shall pay for all expenses incurred for an internet connection if Location provides an ethernet connection for the Kiosk. Location shall pay for all expenses incurred in connection with electrical power usage necessary to operate the Kiosk and related signage. Location shall not interfere with the Kiosk's electrical or internet connectivity for duration of the Agreement and Location shall not disconnect or deactivate the Kiosk or allow the Kiosk to be disconnected or deactivated. If the Kiosk remains disconnected or deactivated after Owner provides written notice, Owner will be excused from paying the Location Fee for so long as the Kiosk remains disconnected or deactivated and Location shall be liable to Owner for a "Disconnection Fee" in the amount of One Hundred ($100.00) for each day the Kiosk remains disconnected or deactivated. The Parties acknowledge and agree that the Disconnection Fee is not a penalty but is instead intended to be liquidated damages. The Parties agree and acknowledge that Owner's damages would be difficult to estimate upon disconnection or deactivation of the Kiosk but that One Hundred Dollars per day ($100.00) is a reasonable method of calculating Owner's damages and the Parties agree that this

2

provision should be read as liquidated damages rather than a penalty. Location's liability for the Disconnection Fee will continue during the Term for so long as the Kiosk remains disconnected or deactivated. Owner may retrieve the Kiosk for purposes of safe keeping, but Owner's acceptance of the Kiosk will not discharge Location of its obligation to pay the Disconnection Fee. Location agrees to pay Owner's reasonable attorney's fees and expenses of litigation in the event Owner engages counsel to collect the Disconnection Fee. Notwithstanding the foregoing, the Disconnection Fee shall not apply to interference directly resulting from power outages beyond the reasonable control of the Location and/or an agent or party acting on behalf of the Location.

9. **Exclusivity; Competitors:**

9.1    Location shall not permit the removal of the Kiosk from the Premises for the duration of the Term.

9.2    Location shall not enter into an agreement with any Competitor or allow the placement of a Competitor's kiosk on the Premises (whether inside or outside the Premises) or anywhere on the underlying real property on which the Premises are located, nor subscribe to any processing service for the purchase or sale of virtual currency on the Premises that may compete with the Owner's Kiosk during the term of this Agreement. For purposes of this Agreement, "Competitor" means any person or entity that trades virtual currency; owns or operates digital currency kiosks; or conducts, authorizes, offers or provides services and products of the type conducted, authorized, offered or provided by Bitcoin Depot during the term of this Agreement or any person or entity that facilitates the purchase or sale of digital currency.

9.3    Location agrees that Owner shall have the exclusive right to provide digital currency kiosks or any terminal that can conduct and/or execute digital currency transactions to Location and to all other business sites occupied (including by way of ownership, lease or sublease) by Location.

9.4    If Location violates this Agreement by entering into an agreement with a Competitor and fails to cure such violation within ten (10) days after receipt of Owner's notice of the violation, Owner shall have all remedies provided by law.

9.5    Location's obligations under this Section 9 have been assumed as an accommodation to Owner and as a material inducement to Owner to enter into this Agreement. Any breach of Location's obligations under this Section 9 shall be deemed a material breach of this Agreement. The Parties agree that Location's breach of this exclusivity agreement would cause irreparable damage to Owner and monetary damages would provide inadequate remedy to Owner. Owner will be entitled to seek temporary and permanent injunctive relief to prohibit additional violations of this exclusivity agreement in addition to seeking any award of damages for such violation.

3

10. **Protection Requirements:** Location shall exercise due care for the safekeeping and maintenance of the Kiosk. Location shall not be held liable for damage, theft or loss of the Kiosk except in cases of fraud, gross negligence, or intentional malfeasance by the Location. Owner shall have no liability to Location in the event of theft, damage or loss caused by the Kiosk.

11. **Ownership of Premises or Lease Term(s):** Location represents and warrants that it is the owner of the Premises or that it holds a lease or option to renew a lease of the Premises of equal or greater length than the Initial Term (as defined below) of this Agreement. If Location leases the premises, the Location shall notify Owner of any dispossessory or distress proceedings initiated against Location or the Premises within twenty-four (24) hours of being served with process of the dispossessory or distress proceedings. In the event that dispossessory or distress proceedings are initiated against Location, Owner has the right to terminate this Agreement and reclaim possession of the Kiosk.

12. **Relocation; Sale; Expansion:** In the event Location transfers or moves its business from the Premises, expands its business to additional sites, or if Location sells its business or substantially all of its assets, Location shall provide Owner with at least sixty (60) days' advance written notice of such occurrence (or as much notice as reasonably practicable) ("Location's Notice"). Owner shall have the exclusive option to install an additional Kiosk at the Location's (or its successor in interest's) new business site(s) along the same terms and conditions set forth in this Agreement (the "Option"); and Owner may exercise its Option by delivering written notice of its intent to exercise its Option within thirty (30) days from its receipt of Location's Notice. Location agrees that, in the event of transfer, move or sale of Location's business, this Agreement remains in full force and effect as to the Location's new business site(s) and Exhibit "1" shall be deemed amended so that the Premises shall include the Location's new business site(s). If the Location is sold or sells substantially all of its assets outside the ordinary course of business, this Agreement will terminate and Location's obligations discharged so long as Location provides a document to Owner evidencing the sale such as a receipt, asset purchase agreement or bill of sale.

13. **Term:** This Agreement shall be for a term ~~Seven~~ (7) years from the date of installation of the Kiosk at the Premises, unless amended or terminated by written agreement signed by both Owner and Location, or terminated as set forth below (the "Initial Term"). Upon the expiration of the Initial Term, this Agreement will automatically renew for subsequent additional terms ~~of seven~~ (7) years each on the same terms and conditions as provided herein unless canceled by written notice at least ninety (90) days prior to expiration of the then current term (the Initial Term, as extended, the "Term").

14. **Termination:** Upon the occurrence of a breach, either party may terminate this Agreement effective ten (10) days after giving written notice of intent to terminate, provided that such breach continues for ten (10) days after notice of such breach. Either party may terminate this Agreement in accordance with the terms and provisions of Section 13. In addition, Owner may terminate this Agreement upon giving thirty (30) days prior written notice to Location. Owner has the right to terminate this Agreement immediately in the event of damage, destruction, vandalism, misuse, loss, or the Owner, in good faith, believes that the

4

Kiosk is at risk for damage, destruction, vandalism, misuse or loss. Even if the Agreement is terminated, Location's obligation to pay a Disconnection Fee shall survive for the duration of the length of the Term. In the event the Agreement is terminated, Owner may declare all Disconnection Fees due for the length of the Term immediately due and payable so long as the Owner discounts the future Disconnection Fees to a net present value using the Wall Street Journal's Prime Rate.

All notices hereunder shall be in writing and shall be deemed given upon personal delivery or upon deposit in the United States certified mail, return receipt requested, with postage paid or by overnight receipted courier service, addressed to Owner and Location at their respective addresses as listed below. Any party may change its address for notice in accordance with the terms of this paragraph.

15. **Disclaimer:** EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, LOCATION UNDERSTANDS AND AGREES THAT OWNER MAKES NO WARRANTY, EXPRESS, IMPLIED, OR STATUTORY AS TO ANY MATTER WHATSOEVER, INCLUDING THE CONDITION OF THE KIOSK, ITS MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. OWNER SHALL IN NO EVENT BE RESPONSIBLE FOR ANY LOST PROFITS OR INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR INDIRECT DAMAGES THAT LOCATION MAY INCUR. OWNER'S SOLE LIABILITY TO LOCATION HEREUNDER, EXCEPT AS OTHERWISE PROVIDED, SHALL BE TO REMEDY ANY BREACH OF THIS AGREEMENT IN A TIMELY MANNER. NEITHER PARTY WILL BE LIABLE FOR FAILURE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT IF SUCH FAILURE IS DUE TO ACTS OR EVENTS BEYOND SUCH PARTY'S REASONABLE CONTROL.

16. **Not Assignable:** Location shall not assign or dispose of any of its rights or obligations under this agreement without prior written consent of Owner. This agreement is binding on the successors and permitted assigns of the parties.

17. **Waiver:** A waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of that party's rights to otherwise demand strict compliance with this Agreement and any and all provisions hereof.

18. **Arbitration:** Except as specified in this Section 18, any dispute, controversy, or claim arising out of or relating to this Agreement or the breach, termination or validity of this Agreement will be submitted to arbitration as prescribed herein. The parties will agree on a single arbitrator within thirty (30) days of receipt of a notice of intent to arbitrate. Such arbitrator will be knowledgeable about the ATM industry and will conduct the arbitration under the current Commercial Arbitration rules of the American Arbitration Association ("AAA"), unless otherwise provided herein. The arbitrator will be selected in accordance with AAA procedures from a list of qualified people maintained by AAA. The arbitration will be conducted in Atlanta, Georgia. The arbitrator's decision and award will be final and binding, and judgement upon the award rendered by the arbitrator may be entered in any

5

court having jurisdiction thereon. Any duty to arbitrate under this Agreement will remain in effect and enforceable after termination of this Agreement for any reason.

19. **Entire Agreement:** This Agreement, including any schedule or exhibit attached hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof. There are no other promises, representations, terms, conditions, or obligations other than those contained herein. This agreement supersedes all prior communications, representations or agreements, oral or written, between the parties and shall not be modified except in writing signed by both parties.

20. **Controlling Law:** This Agreement shall be construed, interpreted, and enforced in accordance with the laws of the State of Georgia, without regard to its conflict of law principles. The jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in Fulton County, Georgia or any county where Owner (or its successor in interest) maintains its principal place of business or residence.

21. **Counterparts:** This Agreement may be executed in counterparts and exchanged via email transmission. Each email transmitted counterpart (including pdf) bearing a signature shall be an original for all purposes and all such counterparts shall constitute one and the same agreement.

22. **Third-Party Beneficiaries.** There shall be no Third-Party Beneficiaries to this agreement.

6

# EXHIBIT 2

## Kiosk Placement Form

| Location Legal Entity:  PDD, Inc. | Effective Date:  5-18-2021 |
|---|---|
| Location DBA Name: NorthTown Division | Pacific Distributing |
| Phone: 509-489-9039 | Distributor Name (Entity and DBA): |
| Email: bdive1@msn.com | Phone: 1-800-548-1913 |
| Address to be used for payment:  4615 N. Division St  Spokane, WA. 99207 | Email: pacificdistributing.868 |
| Tenant or Landlord?   Tenant | Sales Contact: Gmail.com  Mark Smith 770 670 9095  mark@bitcoindepot.com |
| If Tenant, lease end date: 12/31/2039 | |
| Term:   7 - Years | |

| Premises  [Put full address of store] | Additional Entity  (if applicable) | Per Trans.  Fee | Flat Fee: |
|---|---|---|---|
| 4615 North Division  Spokane, WA  99207 | | 1.50 | 150.00 |
| | | | |
| | | | |

By signing below, Location and Bitcoin Depot expressly agree to be bound by all of the terms and conditions of the Location Master Agreement located at get.bitcoindepot.com/LMA or such other URL or address as provided by Bitcoin Depot from time to time ("LMA"), which is hereby incorporated by reference. Capitalized terms shall have the meaning set forth in the LMA. Location acknowledges and agrees that it has read and understands the terms set forth in the LMA and that all information in this Kiosk Placement Form is accurate and complete.

Owner:

Signed: Landon Thomas

Lux Vending, LLC d/b/a Bitcoin Depot
2870 Peachtree Rd #327
Atlanta, Georgia, 30305

Name: _____

Location:

Signed: _____

5/9/1

Name: Robert A. Overbiss

Title: President

Address: 40303 North Shore Dr.
Loon Lake, WA. 99148

# EXHIBIT 3

DocuSign Envelope ID: F7451D98-11D9-4BC3-831F-E54723A23D4A

## Kiosk Placement Form

| Location Legal Entity: DDD, INC. | Effective Date: 10/29/2021 |
|---|---|
| Location DBA Name: MEAD CHEVRON | PACIFIC DISTRIBUTING |
| Phone: 509-465-0670 | Distributor Name. Entity/DBA |
| Email: bdive19new.com | Phone: 771-335-1941 3C |
| Address to be used for payment: 3812 E. Highland Rd MEAD, WA 99021 | Email: PACIFICDISTRIBUTING @ 8 MAIL.com |
| | Sales Contact: Mark Smith 70 670 9095 mark@bitcoindepot.com |
| Tenant or Landlord: LANDLORD | |
| If Tenant, lease end date: | |
| Term: 7 YRS | |

| Premises [Put full address of store] | Additional Entity (if applicable) | Per Trans. Fee | Flat Fee: |
|---|---|---|---|
| 3812 E. HIGHLAND RD MEAD, WA 99021 | | 150 | 150.00 |

By signing below, Location and Bitcoin Depot expressly agree to be bound by all of the terms and conditions of the Location Master Agreement located at get.bitcoindepot.com/LMA or such other URL or address as provided by Bitcoin Depot from time to time ("LMA"), which is hereby incorporated by reference. Capitalized terms shall have the meaning set forth in the LMA. Location acknowledges and agrees that it has read and understands the terms set forth in the LMA and that all information in this Kiosk Placement Form is accurate and complete.

Owner:
Signed: _Landon Thomas_
Lux Vending, LLC d/b/a Bitcoin Depot
2870 Peachtree Rd #327
Atlanta, Georgia, 30305
Name: Landon Thomas

Location:
Signed: _____
Name: Robert A. Dwelling
Title: President
Address: 3812 E. HIGHLAND RD MEAD, WA 99021

# EXHIBIT 4

I sent a certified letter to Glenn for processing on my atm machines. I did not send a certified letter to you., spaced it. Can you use the emails I have sent to you and our phone conversations to serve as notice of sale. The sale is closing 12/1/22. The new owners, Par Pacific do not want the Bitcoin Machines. There will not be a bill of sale until closing. Do you need the original LOI dated in April of this year? The purchase and sale agreement dated 10/7/22 or is this email sufficient that I am in fact selling? Can you make arrangements to have the machines removed please.

Thank you,
Bob Divelbiss
253-318-8586 cell

From: Mark Smith <mark@bitcoindepot.com>
Sent: Monday, October 3, 2022 10:13 AM
To: Robert Divelbiss <bdivel@msn.com>; glen coulter <pacificdistributing.gc@gmail.com>
Subject: Re: Mead and Northtown Chevrons

Hi Bob,

I have attached the two contracts that are currently in effect for your reference. We would request written notice that you are selling the store and something showing either the intent to sell or bill of sale to validate the sale. We ask you to do your best in representing the product to the new owner so we may keep the kiosks in the locations.

Since Glen Coulter at Pacific NW Distributing originally set up your account, he can assist you with getting the new owner under contract. I have included the agreement that we would need them to consider...Glen Coulter can provide a formal proposal to them.

Thank you,

Mark Smith

On Mon, Oct 3, 2022 at 12:12 PM Robert Divelbiss <bdivel@msn.com> wrote:
Mark,

We spoke on the phone last week about me selling my business's and retiring. You said that there would be no penalty to take the machines out if the new owners do not want them. As I recall you said there would be a 2 year non compete on the sites and you would need at least 2 weeks notice to have the machines removed.

What paperwork etc, will be needed to 1. transfer contracts to new owner and 2. Cancel contracts and remove equipment. They are still unsure at this time but I would like to be prepared for either scenario. We are set to close on Dec 1.

Thank you,

Bob Divelbiss
253-318-8586 cell

--
Mark D. Smith
Business Development Manager
Bitcoin Depot
770-670-9095
mark@bitcoindepot.com
https://www.bitcoindepot.com/
Schedule a Call and other Useful Information

# EXHIBIT 5

Lux Vending Bitcoin Machines

Robert Divelbiss <bdivel@msn.com>
Tue 10/11/2022 10:02 AM
To: mark@bitcoindepot.com <mark@bitcoindepot.com>

Mark,

We spoke several weeks ago about me selling my business's at 3812 E Highland Rd, Mead, WA 99021 and 4615 North Divisions, Spokane, WA 99207 and retiring. You said that because it is a sale and the new owners do not want the machines that there wouldn't be penalties for having them removed.  I tried to get them to assume the contracts, but they have different plans. I will let them know that there is a 2 year no compete. I entered into a formal purchase agreement with Par Pacific on 10/7/22 and we are set to close on 12/1/22.

Please consider this my notice to terminate the contracts as of 12:01am on 12/1/22.  This should give you plenty of time to have the machines removed.

It has been a pleasure working with you.

Sincerely,
Robert Divelbiss
President
DDD Inc

# EXHIBIT 6

Re: Lux Vending Bitcoin Machines

Mark Smith <mark@bitcoindepot.com>
Tue, 07/11/2022 10:15 AM
To: Robert Divelbiss <bdivel@msn.com>

Thank you for the update and I will have the appropriate team take it from here.

Mark Smith

On Tue, Oct 11, 2022 at 1:03 PM Robert Divelbiss <bdivel@msn.com> wrote:
Mark,

We spoke several weeks ago about me selling my business's at 3812 E Highland Rd, Mead, WA 99021 and 4615 North Divisions, Spokane, WA 99207 and retiring. You said that because it is a sale and the new owners do not want the machines that there wouldn't be penalties for having them removed. I tried to get them to assume the contracts, but they have different plans. I will let them know that there is a 2 year no compete. I entered into a formal purchase agreement with Par Pacific on 10/7/22 and we are set to close on 12/1/22.

Please consider this my notice to terminate the contracts as of 12:01am on 12/1/22. This should give you plenty of time to have the machines removed.

It has been a pleasure working with you.

Sincerely,
Robert Divelbiss
President
DDD Inc

--
Mark D. Smith
Business Development Manager
Bitcoin Depot
770-670-9095
mark@bitcoindepot.com
https://www.bitcoindepot.com/
Schedule a Call and other Useful Information

**BITCOIN DEPOT**

Fwd: Lux Vending Bitcoin Machines

Mark Smith <smark@bitcoindepot.com>
Tue 11/15/2022 10:20 AM
To:Jana McCracken <jana@bitcoindepot.com>;Kevin Brunoldi <kevin.brunoldi@bitcoindepot.com>;glen coulter
<pacificdistributing.gc@gmail.com>;Robert Divelbiss <bdivel@msn.com>

Hi Team,

Please see the notice of termination due to selling the stores at these locations listed below.  As per the email, the
store owner has done all in his power to retain the kiosks in these stores.  Our distributor, Glen Coulter at Pacific NW
Distributing, is also waiting on the contact information of the new owners to see if he can convince them to keep our
terminals.  But, as of now, we do not have a contract with the new owners and should schedule the removal of these
kiosks.

Please see below and take appropriate actions to terminate the agreement.

Thank you,

Mark Smith


Mark,

We spoke several weeks ago about me selling my business's at 3812 E Highland Rd, Mead, WA 99021 and 4615 North
Divisions, Spokane, WA 99207 and retiring. You said that because it is a sale and the new owners do not want the
machines that there wouldn't be penalties for having them removed.  I tried to get them to assume the contracts, but
they have different plans. I will let them know that there is a 2 year no compete. I entered into a formal purchase
agreement with Par Pacific on 10/7/22 and we are set to close on 12/1/22.

Please consider this my notice to terminate the contracts as of 12:01am on 12/1/22. This should give you plenty of time
to have the machines removed.

It has been a pleasure working with you.

Sincerely,
Robert Divelbiss
President
DDD Inc


--
Mark D. Smith
Business Development Manager
Bitcoin Depot
770-670-9095
mark@bitcoindepot.com
https://www.bitcoindepot.com/
Schedule a Call and other Useful Information


**BITCOIN DEPOT**

# EXHIBIT 8

**From:** Kristin Fetter <kristin.fetter@bitcoindepot.com>
**Sent:** Tuesday, November 15, 2022 7:42 AM
**To:** Mark Smith <mark@bitcoindepot.com>; Kevin Brunoldi <kevin.brunoldi@bitcoindepot.com>
**Cc:** Robert Divelbiss <bdivel@msn.com>; glen coulter <pacificdistributing.gc@gmail.com>
**Subject:** Re: Mead and Northtown Chevrons

Good Morning,

I will work on getting these taken care of for you. I do see an external move ticket already opened for 4615 N Division. Removal ETA is set for 11/22/2022 at this site.

I will keep you posted on the progress of the location; 3812 E Highland Rd

Thank you,
Kristin Fetter , Senior Account Manager
Kristin.Fetter@bitcoindepot.com
1-470-615-9166 | bitcoindepot.com

## BITCOIN DEPOT

On Tue, Nov 15, 2022 at 8:41 AM Mark Smith <mark@bitcoindepot.com> wrote:
Thank you for the update, Robert. If you could provide the LOI that would be helpful in our documentation.

Kristen ... we've been advised by the owner (Robert) of these two locations that they are selling the store. Robert, Glen Coulter (distributor), and I have been in touch with Par Pacific and they do not wish to continue with our products. They have a partnership with another bitcoin company and will not be honoring our agreements at these locations.

With this in mind, let's please plan to pull these terminals ASAP as the sale has already taken place and the transition is in progress. Contracts are attached for reference and please review this email thread for context to this sale.

Thank you,

Mark Smith

1

# EXHIBIT 9

Re: Mead and Northtown Chevrons

Robert Divelbiss <bdivel@msn.com>
Fri 11/18/2022 8:59 PM
To: Mark Smith <mark@bitcoindepot.com>

Mark,

In late September I spoke with you about my wife being diagnosed with cancer and my decision to retire. At that time I did not know if Par Pacific could be talked into keeping the bitcoin machines or not. I asked what fees there would be if they don't want them. You stated there would be none because this is a sale situation and that you needed 2 weeks to have them removed. Glen at Pacific Distributing says that you will be charging me termination fees! Is this correct?

Bob Divelbiss

From: Mark Smith <mark@bitcoindepot.com>
Sent: Tuesday, November 15, 2022 5:41 AM
To: Robert Divelbiss <bdivel@msn.com>; Kristin Fetter <kristin.fetter@bitcoindepot.com>; glen coulter <pacificdistributing.gc@gmail.com>
Subject: Fwd: Mead and Northtown Chevrons

Thank you for the update, Robert. If you could provide the LOI that would be helpful in our documentation.

Kristen ... we've been advised by the owner (Robert) of these two locations that they are selling the store. Robert, Glen Coulter (distributor), and I have been in touch with Par Pacific and they do not wish to continue with our products. They have a partnership with another bitcoin company and will not be honoring our agreements at these locations.

With this in mind, let's please plan to pull these terminals ASAP as the sale has already taken place and the transition is in progress. Contracts are attached for reference and please review this email thread for context to this sale.

Thank you,

Mark Smith

---------- Forwarded message ---------
From: Robert Divelbiss <bdivel@msn.com>
Date: Mon, Nov 14, 2022 at 8:22 PM
Subject: Re: Mead and Northtown Chevrons
To: Mark Smith <mark@bitcoindepot.com>

Mark,
I sent a certified letter to Glenn for processing on my atm machines. I did not send a certified letter to you., spaced it. Can you use the emails I have sent to you and our phone conversations to serve as notice of sale. The sale is closing 12/1/22. The new owners, Par Pacific do not want the Bitcoin Machines. There will not be a bill of sale until closing. Do you need the original LOI dated in April of this year? The purchase and sale agreement dated 10/7/22 or is this email sufficient that I am in fact selling? Can you make arrangements to have the machines removed please.

Thank you,
Bob Divelbiss
253-318-8586 cell

From: Mark Smith <mark@bitcoindepot.com>
Sent: Monday, October 3, 2022 10:11 AM
To: Robert Divelbiss <bdivel@msn.com>; glen coulter <pacificdistributing.gc@gmail.com>
Subject: Re: Mead and Northtown Chevrons

Page 34

# EXHIBIT 10

Re: Mead and Northtown Chevrons

**Mark Smith <mark@bitcoindepot.com>**
Mon 11/21/2022 6:52 AM
To: Robert Divelbiss <bdivel@msn.com>

Hi Bob,

In this situation, there is not a penalty due to the fact that you are selling your business and the new owners are not interested in keeping the kiosk. There are circumstances where early removal from a location does incur penalties, but that when the owners are pulling one on us and bringing in a competitor.  In your case, you're selling the store and the new owners have their own bitcoin partner. The only thing to do is pick these up and thank you for hosting us during your tenure.

Thank you!

Mark Smith

On Fri, Nov 18, 2022 at 6:59 PM Robert Divelbiss <bdivel@msn.com> wrote:

> Mark,
>
> In late September I spoke with you about my wife being diagnosed with cancer and my decision to retire. At that time I did not know if Par Pacific could be talked into keeping the bitcoin machines or not. I asked what fees there would be if they don't want them. You stated there would be none because this is a sale situation and that you needed 2 weeks to have them removed. Glen at Pacific Distributing says that you will be charging me termination fees! Is this correct?
>
> **Bob Divelbiss**
>
> **From:** Mark Smith <mark@bitcoindepot.com>
> **Sent:** Tuesday, November 15, 2022 5:44 AM
> **To:** Robert Divelbiss <bdivel@msn.com>; Kristin Fetter <kristin.fetter@bitcoindepot.com>; glen coulter <pacificdistributing.gc@gmail.com>
> **Subject:** Fwd: Mead and Northtown Chevrons
>
> Thank you for the update, Robert. If you could provide the LOI that would be helpful in our documentation.
>
> Kristen ... we've been advised by the owner (Robert) of these two locations that they are selling the store. Robert, Glen Coulter (distributor), and I have been in touch with Par Pacific and they do not wish to continue with our products. They have a partnership with another bitcoin company and will not be honoring our agreements at these locations.
>
> With this in mind, let's please plan to pull these terminals ASAP as the sale has already taken place and the transition is in progress. Contracts are attached for reference and please review this email thread for context to this sale.
>
> Thank you,
>
> Mark Smith
>
> ---------- Forwarded message ---------
> **From:** Robert Divelbiss <bdivel@msn.com>
> **Date:** Mon, Nov 14, 2022 at 8:22 PM
> **Subject:** Re: Mead and Northtown Chevrons
> **To:** Mark Smith <mark@bitcoindepot.com>
>
>
> **Mark,**

# EXHIBIT 11

Hope to have an update soon for you, thank you for your understanding.

**Kristin Fetter** | Senior Account Manager
Kristin.Fetter@bitcoindepot.com
1-470-645-9166 | bitcoindepot.com

### BITCOIN DEPOT

On Mon, Nov 28, 2022 at 2:53 PM Robert Divelbiss <bdivel@msn.com> wrote:
Those are correct. The new owners will be there on the 1st. They need to be out by then.

Bob

**From:** Kristin Fetter <kristin.fetter@bitcoindepot.com>
**Sent:** Monday, November 28, 2022 11:48 AM
**To:** Robert Divelbiss <bdivel@msn.com>; Kevin Brunoldi <kevin.brunoldi@bitcoindepot.com>
**Subject:** Re: Fw: Bitcoin machines at Northtown and Mead Chevrons

Hello Bob,

Can you confirm these are the correct addresses?

Northtown Chevron - 4615 N Division St Spokane WA 99207 - **kiosk removal date is showing 11/22 following up with operations to confirm details for actual removal**
Mead Chevron - 3812 E. Highland Road Mead WA 99021 - **reaching out for an update. Will keep you posted as soon as I hear anything.**

I have also added the Account Manager who is directly working through these cases - Kevin.

**Kristin Fetter** | Senior Account Manager
Kristin.Fetter@bitcoindepot.com
1-470-645-9166 | bitcoindepot.com

### BITCOIN DEPOT

On Mon, Nov 28, 2022 at 12:22 PM Robert Divelbiss <bdivel@msn.com> wrote:
Kristin,  I see Mark is out of the office. Can you verify the removal date for the machines please.

Thank you.

Bob
253-318-8586

**From:** Robert Divelbiss
**Sent:** Monday, November 28, 2022 9:43 AM
**To:** Mark Smith <mark@bitcoindepot.com>
**Subject:** Bitcoin machines at Northtown and Mead Chevrons

Good morning Mark. As of this morning your machines are still in my stores. Par takes ownership in 2 days. I can't be held responsible for them after the sale.  Can you  please confirm when they are being removed?

Thank you,

Bob

# EXHIBIT 12

On Mon, Nov 28, 2022 at 3:01 PM Kristin Fetter <kristin.fetter@bitcoindepot.com> wrote:
I did pass that information along to the operations team in charge of the removals, and expressed the urgency.

Hope to have an update soon for you, thank you for your understanding.

**Kristin Fetter** | Senior Account Manager
Kristin.Fetter@bitcoindepot.com
1-470-645-9166 | bitcoindepot.com

### BITCOIN DEPOT

On Mon, Nov 28, 2022 at 2:53 PM Robert Divelbiss <bdivel@msn.com> wrote:
Those are correct. The new owners will be there on the 1st. They need to be out by then.

**Bob**

**From:** Kristin Fetter <kristin.fetter@bitcoindepot.com>
**Sent:** Monday, November 28, 2022 9:48 AM
**To:** Robert Divelbiss <bdivel@msn.com>; Kevin Brunoldi <kevin.brunoldi@bitcoindepot.com>
**Subject:** Re: Fw: Bitcoin machines at Northtown and Mead Chevrons

Hello Bob,

Can you confirm these are the correct addresses?

Northtown Chevron - 4615 N Division St Spokane WA 99207 - **kiosk removal date is showing 11/22 following up with operations to confirm details for actual removal**
Mead Chevron - 3812 E. Highland Road Mead WA 99021 - **reaching out for an update. Will keep you posted as soon as I hear anything.**

I have also added the Account Manager who is directly working through these cases - Kevin.

**Kristin Fetter** | Senior Account Manager
Kristin.Fetter@bitcoindepot.com
1-470-645-9166 | bitcoindepot.com

### BITCOIN DEPOT

On Mon, Nov 28, 2022 at 12:52 PM Robert Divelbiss <bdivel@msn.com> wrote:
Kristin, since Mark is out of the office, can you verify the removal date for the machines please.

Thank you.

**Bob**
253-318-8586

**From:** Robert Divelbiss
**Sent:** Monday, November 28, 2022 9:13 AM
**To:** Mark Smith <mark@bitcoindepot.com>
**Subject:** Bitcoin machines at Northtown and Mead Chevrons

Good morning Mark. As of this morning your machines are still in my stores. Par takes ownership in 2 days. I can't be held responsible for them after the sale. Can you please confirm when they are being removed?

# EXHIBIT 13

Re: Fw: Fw: Bitcoin machines at Northtown and Mead Chevrons

Mark Smith <mark@bitcoindepot.com>
Tue 11/29/2022 8:39 AM
To: Robert Divelbiss <bdivel@msn.com>

I'm not sure ... this has been turned over to our Operations Team and we've certainly given them ample time to arrange for removal. We'll continue to work on this matter.

> On Tue, Nov 29, 2022 at 8:35 AM Robert Divelbiss <bdivel@msn.com> wrote:
> will the machines be removed by the first? I can't be responsible for them once I hand over the keys.
> Bob

> From: Mark Smith <mark@bitcoindepot.com>
> Sent: Tuesday, November 29, 2022 8:28 AM
> To: Robert Divelbiss <bdivel@msn.com>
> Subject: Re: Fw: Fw: Bitcoin machines at Northtown and Mead Chevrons
>
> I just learned of this today and am in communication with our team that you have done all in your power to keep these terminals. The demand letter is a formal procedure that must be sent in these situations, but I have this under review since you've been upfront and forthright in this entire process.
>
> Mark

> On Tue, Nov 29, 2022 at 11:24 AM Robert Divelbiss <bdivel@msn.com> wrote:
> Mark, What is with a demand letter etc?
>
> Bob

> From: Robert Divelbiss <bdivel@msn.com>
> Sent: Tuesday, November 29, 2022 8:22 AM
> To: Kristin Fetter <kristin.fetter@bitcoindepot.com>
> Subject: Re: Fw: Bitcoin machines at Northtown and Mead Chevrons
>
>
> I am the old owner. What is a demand letter?

> From: Kristin Fetter <kristin.fetter@bitcoindepot.com>
> Sent: Tuesday, November 29, 2022 8:57 AM
> To: Robert Divelbiss <bdivel@msn.com>; Kevin Brunoldi <kevin.brunoldi@bitcoindepot.com>
> Subject: Re: Fw: Bitcoin machines at Northtown and Mead Chevrons
>
> Good Morning,
>
> For location - Mead Chevron - 3812 E. Highland Road Mead WA 99021 - Legal has confirmed that they are sending a Demand Letter to the old owner as the verbiage in the contract states the agreement is for the location.
>
> Can you please provide the contact information for the new owner as well?
>
> Thank you,
> **Kristin Fetter** | Senior Account Manager
> Kristin.Fetter@bitcoindepot.com
> 1-470-645-9166 | bitcoindepot.com

**BITCOIN DEPOT**

# EXHIBIT 14

Re: Bitcoin machines at Northtown and Mead Chevrons

Robert Divelbiss <bdivel@msn.com>

Wed 11/30/2022 3:37 PM

To: Mark Smith <mark@bitcoindepot.com>;Kristin Fetter <kristin.fetter@bitcoindepot.com>;glen coulter <pacificdistributing.gc@gmail.com>

You have committed to no fees etc.and have known they didn't want them for a long time.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

From: Mark Smith <mark@bitcoindepot.com>
Sent: Wednesday, November 30, 2022 2:51:16 PM
To: Robert Divelbiss <bdivel@msn.com>; Kristin Fetter <kristin.fetter@bitcoindepot.com>; glen coulter <pacificdistributing.gc@gmail.com>
Subject: Re: Bitcoin machines at Northtown and Mead Chevrons

Hi Robert,

This matter will now be handled by our Account Manager, Kristin Fetter at: kristin.fetter@bitcoindepot.com

Our Legal has taken issue since the stores were doing so well ... Par Pacific should be taking over these contracts to avoid us taking action.  If anything, they should allow them to run the full term of the contract before they attempt to replace us.  Try to make this happen.

I've done all I can to help with this, but unfortunately, there is a huge financial loss involved for Bitcoin Depot by early termination and Par Pacific should understand the nature of these contracts and that it's not a simple request to just remove them.

Respectfully,

Mark Smith

On ~~Wed, Nov 23, 2022 at 12:15 PM Robert~~ Divelbiss <bdivel@msn.com> wrote:
Good ~~morning Mark. As noted previously our machines are still in place at our locations. Par Pacific has purchased our location and we are no longer~~
~~held responsible for the matter the sales. Can you please confirm when they are being removed?~~

Thank you,

Bob


--
Mark D. Smith
Business Development Manager
Bitcoin Depot
770-670-9095
mark@bitcoindepot.com
https://www.bitcoindepot.com/
Schedule a Call and other Useful Information

# EXHIBIT 15

Re: Bitcoin machines at Northtown and Mead Chevrons

Mark Smith <mark@bitcoindepot.com>

Thu 12/1/2022 5:28 AM

To: Robert Divelbiss <bdivel@msn.com>;Kristin Fetter <kristin.fetter@bitcoindepot.com>;Kevin Brunoldi <kevin.brunoldi@bitcoindepot.com>;glen coulter <pacificdistributing.gc@gmail.com>

Good morning, Bob,

Please find attached the agreements signed for your locations.  The details of the contract can be found at: **get.bitcoindepot.com/LMA**   This is where you'll find the language as it pertains to early termination of a contract and the rights that Bitcoin Depot retains in these situations.

Bitcoin Depot and Pacific NW Distributing did all in our power to get the locations converted to Par Pacific. They refused, which is why this escalated to this point.

In a typical sale of a store, the new buyers should absorb all of the existing vendor contracts that are still in place, or...the original owner is held accountable.  Your stores have been highly successful and having to remove our terminals is a significant loss for Bitcoin Depot.  I did my best to avoid Legal getting involved, but at this point, they are adamant that this be resolved so we remain at these locations. I'm sorry we could not avoid the path this has taken.  Par Pacific should understand this ... they won't be allowed to place their other terminals in these sites for a 2-year period without us taking action due to our Non-Compete.  It's in their best interest to allow us to fulfill the terms of the original agreements.

This has now been taken out of my hands and Kristin Fetter and Kevin Brunoldi will be the Account Managers that will be communicating with you.

Sincerely,

Mark Smith

On Wed, Nov 30, 2022 at 4:15 PM Robert Divelbiss <bdivel@msn.com> wrote:

Please provide the contracts signed for both locations.

Bob

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** Robert Divelbiss <bdivel@msn.com>
**Sent:** Wednesday, November 30, 2022 3:37:35 PM
**To:** Mark Smith <mark@bitcoindepot.com>; Kristin Fetter <kristin.fetter@bitcoindepot.com>; glen coulter <pacificdistributing.gc@gmail.com>
**Subject:** Re: Bitcoin machines at Northtown and Mead Chevrons

You have committed to do it Par Pacific have known they didn't want them for a long time.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

**From:** Mark Smith <mark@bitcoindepot.com>
**Sent:** Wednesday, November 30, 2022 2:51:16 PM
**To:** Robert Divelbiss <bdivel@msn.com>; Kristin Fetter <kristin.fetter@bitcoindepot.com>; glen coulter <pacificdistributing.gc@gmail.com>
**Subject:** Re: Bitcoin machines at Northtown and Mead Chevrons

Hi Robert,

Page 46

CN: 2320017632

**SN: 5**

PC: 16

**FILED**

**JAN 31 2023**

Timothy W. Fitzgerald
SPOKANE COUNTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

DDD, INC., a Washington corporation,

           Plaintiff,

    v.

LUX  VENDING, LLC D/B/A BITCOIN
DEPOT, a foreign limited liability company,

           Defendant.

**NO. 23-2-00176-32**

**MEMORANDUM IN SUPPORT OF
MOTION FOR DECLARATORY
RELIEF**

## I.    <u>NATURE OF ACTION</u>

This action involves claims for fraud and declaratory relief related to contracts entered into by Plaintiff and Defendant.  Defendant falsely represented the terms of the proposed agreements to induce Plaintiff's to enter into the agreements.  Thereafter, Defendant claimed that a different agreement with materially different terms governed the relationship of the parties to place Defendant in a more favorable position in support of a false damage claim against Plaintiff.  The Agreements at issue were either formed through fraud or a mutual mistake of the parties.  Accordingly, the contracts at issue in this action should be declared void by this Court.

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

## II.     STATEMENT OF FACTS

In April 2021, DDD was contacted by Glen Coulter of Pacific Distributing, an agent/distributor of Lux Vending, LLC dba Bitcoin Depot ("Bitcoin"), to solicit and obtain an agreement with DDD, on behalf of Bitcoin, to allow the placement of a Bitcoin ATM in one of DDD's convenience stores.[1]  Mr. Divelbiss met with Mr. Coulter again on or about 5/18/21 to discuss the agreement to place one of the Bitcoin ATMs in a DDD store. In that meeting, Mr. Coulter told Mr. Divelbiss that bitcoin ATMs were in great demand, and he showed Mr. Divelbiss a brochure on the ATMs.  Mr. Coulter also provided Mr. Divelbiss with a document entitled Kiosk Site Location Agreement, which Mr. Coulter represented was the agreement governing the placement of the ATM machines in DDD's stores.[2]

Mr. Divelbiss thoroughly reviewed the terms of the Kiosk Site Location Agreement on behalf of DDD with specific attention to paragraph 12 of the Agreement, which allowed the agreement to be terminated, with no penalty or termination fee, if DDD decided to sell one of its stores where a Bitcoin ATM had been placed.[3]  At that time, in May 2021, DDD was considering selling all of its stores within the next 2-3 years; as such, this term in the Agreement was material to DDD's decision to enter into the Agreement.[4]

After reviewing the terms of the Kiosk Site Location Agreement, DDD agreed to enter into the agreement with Bitcoin.  DDD was directed by Glen Coulter to sign a Kiosk Placement

---

[1] See Declaration of Robert Divelbiss.

[2] See Kiosk Site Location Agreement is attached as Exhibit 1 to the Declaration of Robert Divelbiss.

[3] See Declaration of Robert Divelbiss.

[4] Id.

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 2

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

Form, which Mr. Coulter said would memorialized the agreement of the parties to the terms of the Kiosk Site Location Agreement.[5]  The Kiosk Placement Form referred to a "Location Master Agreement", which Mr. Coulter represented was the Kiosk Site Location Agreement that DDD had reviewed.[6]  The first ATM was installed at DDD's store located at 4615 N. Division St., Spokane, Washington.[7]

On 10/29/21, Glen Coulter approached DDD again, on behalf of Bitcoin, seeking to place a second ATM at another of DDD's stores.[8]  DDD asked Mr. Coulter whether the same agreement terms governed the placement of the second ATM machine and Mr. Coulter expressly represented that the agreement would be the same as the Kiosk Site Location Agreement provided to DDD previously in May 2021.[9]  DDD, relying specifically on this representation, signed a second Kiosk Placement Form for its Mead store memorializing DDD's agreement to the terms of the Kiosk Site Location Agreement.[10]

DDD began negotiations in earnest with a potential buyer related to the sale of its convenience stores in September 2022.[11]  The buyers, as part of the deal, were making $200,000 available to DDD to pay for contract termination fees that may be asserted by DDD's various

---

[5] Id.

[6] Id.

[7] See Kiosk Placement Form signed on 5/18/21 is attached as Exhibit 2 to the Declaration of Robert Divelbiss.

[8] See Declaration of Robert Divelbiss.

[9] Id.

[10] Id.; See Kiosk Placement Form dated 10/29/21 attached as Exhibit 3 to the Declaration of Robert Divelbiss.

[11] See Declaration of Robert Divelbiss.

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 3

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

vendors incident to the sale.  As such, DDD began contacting its vendors to inform them of the pending sale and to determine the extent of all contract termination fees that would be required to be paid pursuant to the various contracts.[12]  As part of this process, a call was made to Glen Coulter by DDD related to the Bitcoin ATM agreements.  Mr. Coulter directed DDD to contact Mark Smith, Business Development Manager at Bitcoin, to discuss whether any fees would be due for termination of Bitcoin's agreements.[13]

When contacted, Mark Smith first urged DDD to obtain an agreement from the new store owners to assume the Bitcoin contracts, but he assured DDD that if this could not be accomplished there would be no fees related to the termination.[14]  Mr. Smith expressly represented to Mr. Divelbiss during a telephone call that there would be no termination fees or costs associated with the termination of the contracts incident to the sale of the stores.[15]  Mr. Smith stated only that there would be a two year non-compete clause, and that Bitcoin would need a two week notice to remove the machines from the stores.[16]

On 10/3/22, Mr. Divelbiss emailed Mark Smith on behalf of DDD, reminding him of their recent telephone conversation about the termination fees, and asking about the nature of the paperwork that would need to be completed to terminate the ATM agreements and remove the

---

[12] Id.

[13] Id.

[14] Id.

[15] Id.

[16] Id.

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 4

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

ATMs from the stores.[17]  Mr. Smith responded by sending copies of the two kiosk placement forms that DDD had signed, and wrote that he would need documentation, which verified that the sale of the stores had occurred.[18]

The buyer of the stores informed DDD that it did not wish to continue the agreement with Bitcoin after it took ownership of the stores, and that it did not have Bitcoin ATMs in any of its other stores.[19]  On 10/11/22, Mr. Divelbiss sent another e-mail to Mark Smith informing him that the new owner did not want to continue the agreement with Bitcoin, and reminding him that he had agreed to terminate the agreements on behalf of Bitcoin with no termination fees or penalties.[20]  Mr. Divelbiss also informed Mr. Smith that DDD had entered into a formal purchase agreement with the new owners on 10/7/22 and that the sale was scheduled to close on 12/1/22.[21]

In response to the 10/11/22 e-mail correspondence, Mr. Smith thanked Mr. Divelbiss for communicating the information and stated that he would have the appropriate Bitcoin team "take it from here", referring to the removal of the ATMs from the stores.[22]

---

[17] Id.

[18] Id.; See e-mail exchange dated 10/3/22 attached as Exhibit 4 to the Declaration of Robert Divelbiss.

[19] See Declaration of Robert Divelbiss.

[20] Id.

[21] Id.; See also 10/11/22 e-mail correspondence to Mark Smith attached as Exhibit 5 to the Declaration of Robert Divelbiss.

[22] See Declaration of Robert Divelbiss; See e-mail correspondence from Mr. Smith dated 10/11/22 attached as Exhibit 6 to the Declaration of Robert Divelbiss; see also e-mail from Mark Smith to Bitcoin team to remove ATMs dated 10/11/22 attached as Exhibit 7 to the Declaration of Robert Divelbiss.

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

On 11/15/22, Kristin Fetter, Senior Account Manager at Bitcoin, wrote that they had a "move ticket" in their system scheduling the ATM removal for the North Division store on 11/22/22 and that she would keep Mr. Divelbiss posted regarding the Mead store.[23]  On the same day, at Mark Smith's request, DDD sent to Mr. Smith the letter of intent to purchase DDD's stores sent by the buyer to verify the sale.[24]

On 11/18/22, Glen Coulter informed DDD that he thought Bitcoin intended to charge DDD termination fees related to the sale of the business.[25]  This was the first DDD had heard of this after multiple communications with Bitcoin representatives confirming that no such fees would be sought by Bitcoin.[26]  On the same day, Mr. Divelbiss inquired of Mark Smith by e-mail about Bitcoin's new revised position related to termination fees.[27]  In the email, Mr. Divelbiss reminded Mr. Smith that in late September, he had spoken to him about his wife's cancer diagnosis and his decision to retire somewhat early with DDD selling its stores because of this circumstance.[28]  Mr. Divelbiss asked him why Glen Coulter related to him that DDD would be charged termination fees.[29]

--------------------------------

[23] See Declaration of Robert Divelbiss; See also 11/15/22 e-mail correspondence from Kristin Fetter attached as Exhibit 8 to the Declaration of Robert Divelbiss.

[24] See Declaration of Robert Divelbiss.

[25] Id.

[26] Id.

[27] Id.

[28] Id.

[29] Id.; See also 11/18/22 e-mail correspondence attached as Exhibit 9 to the Declaration of Robert Divelbiss.

MEMORANDUM IN SUPPORT OF MOTION FOR DECLARATORY RELIEF - 6

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

Mr. Smith replied to this email on 11/21/22 reaffirming that there would be no termination fees related to the sale of the stores.[30] Mr. Smith also related that there were circumstances where early removal of the machines from a location could incur penalties, but only in the instance where the owners of the location are terminating the agreement with Bitcoin based on a false pretense just to enter into an agreement with another Bitcoin partner.[31] Mr. Smith wrote that because this was not occurring here, the only thing for Bitcoin to do was to pick the ATMs up and thank DDD for hosting the machines during its ownership of the locations.[32]

On 11/28/22, Mr. Divelbiss sent an e-mail correspondence to Mark Smith informing him that the ATMs had not yet been removed from the stores, and that the new owners took ownership of the stores in two days.[33] He further informed Mr. Smith that after the sale closed, DDD could not be held responsible for the ATMs if they had not been removed.[34] Mr. Divelbiss requested that Mr. Smith confirm that the ATMs were going to be removed.[35]

In response, Kristin Fetter replied only asking if the addresses that she had for the stores were correct for the ATM removal.[36] Ms. Fetter was assured that the addresses were correct

---

[30] See Declaration of Robert Divelbiss.

[31] Id.

[32] Id.; See also 11/21/22 correspondence from Mark Smith attached as Exhibit 10 to the Declaration of Robert Divelbiss.

[33] See Declaration of Robert Divelbiss.

[34] Id.

[35] Id.; See 11/28/22 e-mail correspondence sent to Mark Smith attached as Exhibit 11 to the Declaration of Robert Divelbiss.

[36] See Declaration of Robert Divelbiss; see also Exhibit 11 to the Declaration of Robert Divelbiss.

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 7

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

and that the machines needed to be removed from the stores by December 1st.[37]  Ms. Fetter assured DDD that she would pass that information along and express urgency to those charged with the responsibility of removing the machines.[38]

On 11/29/22, DDD received e-mail correspondence from Ms. Fetter informing DDD that it would be receiving a demand letter from Bitcoin related to the removal of the machines.[39]  Mr. Divelbiss then sent e-mail correspondence to Mark Smith on the same day asking him what a demand letter was and asked why DDD would be receiving the letter.[40]  Mr. Smith replied that he had just learned that day that a demand letter would be sent, and further informed Mr. Divelbiss that he understood that DDD had done all it could to obtain an agreement with the new owners to continue hosting the machines in the store locations, and that the demand letter was a "formal procedure" that must be sent in "these situations."[41]  Mr. Smith further stated that the matter was under review since DDD had been so upfront and forthright throughout the entire process.[42]

---

[37] Id.

[38] Id.; See also 11/28/22 e-mail exchange with Kristin Fetter attached as Exhibit 12 to the Declaration of Robert Divelbiss.

[39] See Declaration of Robert Divelbiss; See also 11/29/22 e-mail from Kristin Fetter attached as Exhibit 13 to the Declaration of Robert Divelbiss.

[40] Id.

[41] Id.

[42] Id.; See also 11/30/22 e-mail exchange with Mark Smith attached as Exhibit 14 to the Declaration of Robert Divelbiss.

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 8

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

Thereafter on 11/30/22, Mark Smith sent an email informing DDD that the Bitcoin's legal department had taken issue with the termination of the agreements since Bitcoin had made so much profit with the placement of the ATMs in DDD's stores.[43]  Mr. Smith expressed Bitcoin's position that the new owners "should be taking over these contracts to avoid us taking action", and that the new owners should allow the contracts to run the full term before they attempted to replace Bitcoin.[44]  DDD was urged to "try to make this happen."[45]  Mr. Smith then informed DDD that he had done all he could up to that point, but because of the "huge" financial loss involved for Bitcoin by the early termination, Bitcoin would not be treating the situation as a simple request to remove the machines from the store locations.[46]  Bitcoin had now reversed its position entirely and was making an effort to leverage the new owner's continued participation in the agreements by threatening DDD even though they had no contractual authority to do so.

In response to this, Mr. Divelbiss once again reminded Mr. Smith that he had confirmed multiple times prior that there would be no termination fees pursuant to the agreement DDD had entered into with Bitcoin.[47]  In answer to this, Mr. Smith sent e-mail correspondence on 12/1/22 with a link to a new "Location Master Agreement" that DDD had never before received or

---

[43] See Declaration of Robert Divelbiss.

[44] Id.

[45] Id.

[46] Id.; See also 11/30/22 e-mail correspondence with Mark Smith attached as Exhibit 15 to the Declaration of Robert Divelbiss.

[47] See Declaration of Robert Divelbiss.

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 9

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

seen.[48]  In the email, Mr. Smith asserts, for the first time in all of his many interactions with DDD, that termination fees will apply according to the new Location Master Agreement referenced to the e-mail.[49]  Mr. Smith further asserts that in the typical sale of a store the new buyers "should absorb" all of the existing vendor contracts that are still in place and that if this does not occur, the original owner is held accountable.[50]  He then asserts again that because Bitcoin did so well with the machines in DDD's stores, there is significant loss to Bitcoin, and, therefore, the fees must be assessed against DDD.[51]

Mr. Divelbiss found Bitcoin's demand letter in his junk e-mail folder on 12/3/22, after the close of the sale of DDD's stores.  In the letter, Bitcoin seeks payment of termination fees due to the sale of the stores.  Because Bitcoin's demand for fees was not made until after the sale of DDD's stores closed, the burden of the payment of the fees was not accounted for during the due diligence period prior to the sale.  In addition, no amount of the $200,000 allocated, by the buyer as part of the sale agreement, for payment of termination fees was set aside or allocated for any fees charged by Bitcoin.  As such, any fees Bitcoin should demand at this point would be financial loss to DDD caused by Bitcoin changing its position on termination fees until after the sale closed.  And this after DDD made countless contacts with Bitcoin asking directly whether Bitcoin intended to assess termination fees and DDD was informed countless times by Bitcoin that no termination fees would be sought.

---

[48] Id.

[49] Id.

[50] Id.

[51] Id.; See 12/1/22 e-mail exchange attached as Exhibit 15 to the Declaration of Robert Divelbiss.

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 10

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

To date, Bitcoin has removed the ATM from the Division Street store only; the new buyer has had to remove the Mead store ASTM and store it at its own expense because Bitcoin never made an effort to remove it.

Bitcoin lured DDD into an agreement to place two of its ATMs in DDD's stores by presenting agreement terms that DDD relied upon for its decision to enter into the Agreements. Thereafter, Bitcoin claimed that a different agreement had been entered into by the parties with materially different terms. Based on the claim that a different agreement was the contract governing the placement of the ATMs in DDD's stores, Bitcoin expressed its intent to pursue termination fees against DDD. This is a clear "bate and switch" scenario. At its best, the current situation can be viewed as an instance where there was no meeting of the minds or mutual assent as to the terms of the agreement between the parties because each of the parties believed that a different set of terms applied to the deal. At its worst, this is an example of fraud in the inducement by Bitcoin to obtain an agreement with DDD to place its machines in DDD's stores. Bitcoin presented the terms of the Kiosk Site Location Agreement to convince DDD to enter into the agreement, but asserts that it is going to enforce the terms of a different agreement at a later time when it is more favorable for it to do so. In either scenario, any version of the Agreements at issue in this action are void and this Court should declare in its order that the Agreements are void.

## III.    LEGAL ARGUMENT

### A.    Fraud In The Inducement

The elements that must be satisfied to establish a claim for fraud in the inducement with respect to formation of a contract are: (1) A representation of an existing fact; (2) its materiality;

(3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that the statement should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom the statement is made; (7) reliance on the truth of the statement by the person to whom the representation is made; (8) the right to rely upon the false statement by the person to whom the representation is made; (9) the consequent damage.[52]

Bitcoin clearly made false representations by presenting one set of agreement terms to DDD to induce it to enter into an agreement and then trying to enforce an agreement with a materially different set of agreement terms when attempting to collect termination fees. It does not matter whether Bitcoin's representative knew whether the statements identifying the operative agreement terms were false or not; the statements were clearly materially inaccurate whether by negligence or intent. The agreement terms were presented to DDD by Bitcoin with the specific intent that representatives of DDD would review and rely on the terms in deciding whether to enter into the agreement.

The differences in the terms of each of the agreements are material because DDD considered the termination term in the Kiosk Site Location Agreement it had been presented and it was a primary factor in DDD's decision to enter into the agreement. Had DDD been presented with the "Location Master Agreement" with the 7 year non-terminable term, it would not have entered into the agreement as DDD knew at the time it entered into the agreement that it intended to sell its stores before the term expired.

---

[52] See *Webster v. L. Romano Eng'g Corp.*, 178 Wash. 118, 120–21, 34 P.2d 428, 430 (1934); see also *Baker Boyer Nat'l Bank v. Foust*, 6 Wash. App. 2d 375, 381, 436 P.3d 382, 386 (2018).

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 12

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

DDD relied on the provision in the Kiosk Site Location Agreement which allowed termination of the Agreement with no penalty in determining whether to enter into the agreement or not.  DDD, in its decisions to enter into the Agreement, certainly had a right to rely on the very terms that Bitcoin endorsed as the formal terms of the Agreement Bitcoin was proposing DDD enter into.[53]

Due to Bitcoin's fraud, the damage is obvious.  Bitcoin is now demanding a sum exceeding $100,000 in termination fees.  Additionally, $200,000 was set aside by the buyer of DDD's stores as part of the purchase and sale agreement to pay for termination fees owed pursuant to the various vendor agreements DDD had entered into.  However, Bitcoin did not assert their demand for termination fees until after the sale closed, thereby, depriving DDD of the benefit of these funds to pay for the termination fees.  Further, Bitcoin's demand occurred only after Bitcoin had assured DDD that no such fees would be sought in response to multiple direct contacts by DDD confirming that no fees would be charged.

**B.    Mutual Mistake**

Mutual assent to the terms of a proposed agreement is required for the formation of a valid contract.[54]  Additionally, the Washington Supreme Court recognized that a statement in the form agreement incorporating content and terms by reference does not, in itself, establish mutual

---

[53] It should be noted that both the Kiosk Site Location Agreement and the Location Master Agreement were drafted by Bitcoin.

[54] See Burnett v. Pagliacci Pizza, Inc., 196 Wash.2d 38, 48, 470 P.3d 486, 491 (2020) (citing *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wash.2d 371, 388, 858 P.2d 245 (1993));  see also *DDSSBOS LLC v. Boeing Co.*, 2022 WL 17403214, at *3 (W.D. Wash. Dec. 2, 2022).

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 13

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

assent to the terms being incorporated.[55]  The Court found that it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms.[56]

Moreover, a contract is voidable on grounds of mutual mistake when both parties independently make a mistake at the time the contract is made related to a basic assumption of the contract, unless the party seeking avoidance bears the risk of the mistake.[57]

The true test as to the materiality of the mistake is whether the contract would have been entered into had the mistake not occurred or had the parties been aware of the mistake.[58]

In this case, the mistake is clearly material as Bitcoin has made a significant monetary demand of DDD pursuant to a termination provision in an agreement DDD never reviewed or agreed to.  If Bitcoin maintains that the Location Master Agreement governs the relationship of the parties and DDD maintains that the Kiosk Site Location Agreement governs the parties' relationship, then a significant and material mutual mistake was made at the time of the formation of the Agreements.  As there was no mutual asset to the terms of the proposed agreement and a mistake by both parties occurred regarding the terms contained in the Agreements, the Agreements are void.

---

[55] *Burnett v. Pagliacci Pizza, Inc.*, 196 Wash.2d 38, 49, 470 P.3d 486, 492 (2020).

[56] Id.

[57] See *CPL (Delaware) LLC v. Conley*, 110 Wash. App. 786, 791, 40 P.3d 679, 682 (2002) (citing *Bennett v. Shinoda Floral, Inc.*, 108 Wash.2d 386, 396, 739 P.2d 648 (1987) and the Restatement (Second) of Contracts § 151 (1981) ("A mistake is a belief that is not in accord with the facts.")).

[58] See *Ross v. Harding*, 64 Wash. 2d 231, 240, 391 P.2d 526, 533 (1964); see also *Simonson v. Fendell*, 101 Wash. 2d 88, 92, 675 P.2d 1218, 1221 (1984) (internal citations omitted).

1

## IV.    CONCLUSION

2

Whether by fraud in the formation or mutual mistake, the Agreements purportedly

3

entered into by DDD and Bitcoin are void and should be declared void by order of this Court

4

5

pursuant to RCW 7.24.30.  Pursuant to this motion, DDD seeks an order from this Court

6

declaring void the 5/18/21 and 10/29/21 Agreements related to the placement of Bitcoin's

7

ATMs in stores previously owned by DDD and estopping Bitcoin from demanding or pursuing

8

a claim for termination fees against DDD.

9

10

DATED this 31st day of January, 2023.

11

HAWLEY TROXELL ENNIS & HAWLEY LLP

12

13

By: _____

14

MICHAEL R. MERRITT, WSBA #60094
Counsel for DDD, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 15

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

1

## CERTIFICATE OF SERVICE

2

The undersigned hereby certifies under penalty of perjury under the laws of the State of

3

Washington, that on the 31st day of January, 2023, the foregoing was delivered to the following

persons in manner indicated:

4

5

David F. Ellison

Fortson, Bentley, and Griffin, P.A.

6

Attorneys at Law

2500 Daniell's Bridge Road

7

Building 200, Suite 3A

Athens, GA 30606

8

☐ By Hand Delivery

☒ By U.S. Mail

☐ By Overnight Mail

☐ By Facsimile

☒ By Electronic Mail:

9

10

11

_Mary Newlin_

Mary Newlin, Legal Assistant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF MOTION FOR
DECLARATORY RELIEF
- 16

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

CN: 2320017632

**SN: 6**

PC: 3

**FILED**

**JAN 31 2023**

Timothy W. Fitzgerald
SPOKANE COUNTY CLERK

2023 JAN 31  P 4: 32

TIMOTHY W. FITZGERALD
SPOKANE COUNTY CLERK

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

| | |
|---|---|
| DDD, INC., a Washington corporation,<br><br>          Plaintiff,<br><br>   v.<br><br>LUX  VENDING, LLC D/B/A BITCOIN DEPOT, a foreign limited liability company,<br><br>          Defendant. | **NO. 23-2-00176-32**<br><br>**MOTION FOR DECLARATORY RELIEF** |

1.    **Relief Sought.**  Plaintiff, DDD, Inc. ("DDD"), files this motion asking the Court for a

declaration that agreements entered into by the Plaintiff and Defendant, Lux Vending, LLC dba

Bitcoin Depot ("Bitcoin"), in this case be declared void and unenforceable based on

Defendant's fraud and/or both parties' mutual mistake as to the terms governing the purported

agreements.

2.    **Grounds.**  Bitcoin presented agreement terms to DDD, and represented to DDD it was

the agreement between the parties that would permit Bitcoin to place its bitcoin ATMs in

DDD's convenience stores to induce DDD to enter into the agreement.  Currently, Bitcoin

claims a second different agreement governs the parties' relationship related to the bitcoin

MOTION FOR DECLARATORY RELIEF- 1
{S2521446; 1 }

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

ATMs and has demanded a significant sum of money from DDD based on the terms of this second agreement that DDD never knew agreed to.

3.    **Basis.**  This Motion is made and based on RCW 7.42 et seq., the memorandum of points and authorities in support of this motion incorporated herein, the Declaration of Robert Divelbiss, the papers and pleadings on file in this case, and the arguments of counsel should this matter be heard.

DATED this 31st day of January, 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By: _____
MICHAEL R. MERRITT, WSBA #60094
Counsel for DDD, Inc.

MOTION FOR DECLARATORY RELIEF- 2
{S2521446; 1 }

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

1

## CERTIFICATE OF SERVICE

2

The undersigned hereby certifies under penalty of perjury under the laws of the State of

3 Washington, that on the 31st day of January, 2023, the foregoing was delivered to the following

persons in the manner indicated:

4

5 David F. Ellison                              ☐ By Hand Delivery
Fortson, Bentley, and Griffin, P.A.           ☒ By U.S. Mail
6 Attorneys at Law                              ☐ By Overnight Mail
2500 Daniell's Bridge Road                    ☐ By Facsimile
7 Building 200, Suite 3A                        ☒ By Electronic Mail:
Athens, GA 30606

8

9

10

11 _____
Mary Newlin, Legal Assistant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR DECLARATORY RELIEF- 3                     Hawley Troxell Ennis & Hawley LLP
{S2521446; 1 }                                       422 W. Riverside Ave., Suite 1100
                                                     Spokane, Washington 99201
                                                     509.624.5265

CN: 2320017632
**SN: 7**
PC: 2

~~ED~~

2023 JAN 31  P 4: 32

~~TIMOTHY W. FITZGERALD~~
~~SPOKANE COUNTY CLERK~~

**FILED**

JAN 31 2023

Timothy W. Fitzgerald
**SPOKANE COUNTY CLERK**

---

| **SUPERIOR COURT OF WASHINGTON OF COUNTY OF SPOKANE** | |
|---|---|
| DDD, INC., a Washington corporation, | CASE NO. 23-2-00176-32 |
| Plaintiffs, | NOTE FOR HEARING |
| vs. | ISSUE OF LAW |
| LUX BENDING, LLC D/B/A BITCOIN DEPOT, | (NTMTDK) |
| Defendant. | |

**TO THE CLERK AND TO: Defendant and its attorney of record:**

**PLEASE TAKE NOTICE** that the undersigned has scheduled a hearing on **Plaintiff's Motion for Declaratory Relief.** The hearing is scheduled for **April 14, 2022, at 10:30 AM (with oral argument)** before the assigned **Judge Annette S. Plese, Spokane County Superior Court, 1116 W. Broadway, Dept. 1, Spokane, WA  99260-0350.**

Motions must be confirmed NO LATER THAN 12:00 NOON, 3 DAYS BEFORE THE HEARING by contacting the judicial assistant for the assigned judge, or the presiding judge for cases that are not assigned.

Name: Michael R. Merritt                    Bar ID: 60094

                                                         Telephone No.: 509-624-5265

Address: 422 W. Riverside Ave., Suite 1100

City, State, Zip: Spokane, WA 99201

Signed: _(signature)_                    Date: 1/31/23

### AUTHORITIES

Cite those authorities which form primary basis for your legal position. Where case authority is cited, provide reference to specific page of opinion which is controlling. Likewise, reference applicable sections or subsection of statutes or court rules. This does not substitute for required Memorandum of Authorities.

Applicable Court Rule: _____
Applicable Statutes:    RCW 7.42, et seq._____
Applicable Case Law:    See Memorandum in Support of Motion_____

---

NOTE FOR HEARING – ISSUE OF LAW
CR 40(a)(2): RCW 4.44.020                                    Rev: 07/2019
S2523574.DOC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 31st day of January, 2023, the foregoing was delivered to the following persons in the manner indicated:

David F. Ellison
Fortson, Bentley, and Griffin, P.A.
Attorneys at Law
2500 Daniell's Bridge Road
Building 200, Suite 3A
Athens, GA 30606

☐ By Hand Delivery
☒ By U.S. Mail
☐ By Overnight Mail
☐ By Facsimile
☒ By Electronic Mail:

Mary Newlin, Legal Assistant

```
CASE NUMBER
2320017632
SN:9.0 PC:3
```

FILED
2/3/2023
Timothy W Fitzgerald
Spokane County Clerk

SUPERIOR COURT OF WASHINGTON FOR SPOKANE COUNTY

DDD, Inc. a Washington corporation,

                         Plaintiff,

      v.

LUX VENDING, LLC d/b/a BITCOIN
DEPOT, a foreign limited liability corporation,

                         Defendant.

No. 23-2-00176-32

**NOTICE OF APPEARANCE**

*[Clerk's Action Required]*

TO:        Clerk of the Court;

AND TO:     All parties and counsel of record.

     PLEASE TAKE NOTICE that John T. Bender of Corr Cronin LLP hereby enters

appearance in this matter on behalf of Defendant Lux Vending, LLC d/b/a Bitcoin Depot.

This appearance is without waiver of any defenses or objections of Defendant Lux Vending,

LLC d/b/a Bitcoin Depot, including without limitation, improper service, lack of service of

process, insufficient process, improper venue, lack of personal jurisdiction, lack of subject

matter jurisdiction, federal diversity jurisdiction, or mandatory arbitration.

NOTICE OF APPEARANCE – 1

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

    All future notices and pleadings directed to Defendant Lux Vending, LLC d/b/a Bitcoin Depot should be served upon counsel at the address below, exclusive of original process and service of process.

       DATED:  February 3, 2023.


                              CORR CRONIN LLP


                              s/ John T. Bender
                              John T. Bender, WSBA No. 49658
                              1015 Second Avenue, Suite Floor 10
                              Seattle, WA  98104-1001
                              (206) 625-8600 Phone
                              (206) 625-0900 Fax
                              jbender@corrcronin.com

                              Attorneys for Defendant


NOTICE OF APPEARANCE – 2

**CERTIFICATE OF SERVICE**

The undersigned certifies as follows:

1.    I am employed at Corr Cronin LLP, attorneys for Defendant Lux Vending, LLC d/b/a Bitcoin Depot herein.

2.    On February 3, 2023, I caused a true and correct copy of the foregoing document to be served on the following in the manner indicated below:

| | |
|---|---|
| Michael R. Merritt, WSBA No. 60094 | ☐ Legal Messenger |
| 422 W. Riverside Avenue, Suite 1100 | ☒ E-Mail |
| Spokane, WA  99201 | ☐ ECF/E-Service |
| mmerritt@hawleytroxell.com | ☒ 1st Class Mail |
| *Attorneys for Plaintiff* | ☐ Overnight Mail |

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED at Seattle, Washington on February 3, 2023.

*s/ Donna Patterson*
Donna Patterson

NOTICE OF APPEARANCE – 3

1
2
3
4
5
6
7        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
8            IN AND FOR THE COUNTY OF SPOKANE
9
10   DDD, INC., a Washington corporation,
                                                    NO. 23-2-00176-32
              Plaintiff,
11
                                                    **DECLARATION OF MICHAEL R.**
     v.                                             **MERRITT**
12
13   LUX  VENDING, LLC D/B/A BITCOIN
     DEPOT, a foreign limited liability company,
14
              Defendant.
15
16
17
18        I, Michael R. Merritt, state and declare as follows:

19        1.   I am over 18 years old, I am licensed to practice in the state of Washington, and I am
20
             counsel of record for DDD, Inc. in the above referenced action.  I am competent to
21
             testify and make this declaration based on personal knowledge.
22
          2.   The Complaint attached as Exhibit 1 to this Declaration and in support of the Motion
23
             for Preliminary Injunction is a true and correct copy of the Complaint filed in this
24
             matter.
25
26
27
28

DECLARATION OF MICHAEL R. MERRITT- 1        Hawley Troxell Ennis & Hawley LLP
{S2521446; 1 }                              422 W. Riverside Ave., Suite 1100
                                            Spokane, Washington 99201
                                            509.624.5265

3.  The correspondence attached as Exhibit 2 to this Declaration is a true and correct copy of the letter dated January 23, 2023 from counsel for Defendant to the undersigned.

4.  The correspondence attached as Exhibit 3 to this Declaration is a true and correct copy of the letter dated February 1, 2023 from counsel for Defendant to the undersigned.

Declarant makes this declaration under penalty of perjury and pursuant to the laws of the State of Washington.

DATED this 6th day of February, 2023.

Michael R. Merritt

DECLARATION OF MICHAEL R. MERRITT- 2
{S2521446; 1 }

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the 9th day of February, 2023, the foregoing was delivered to the following persons in manner indicated:

John T. Bender
Corr Cronin LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001

☐ By Hand Delivery
☒ By U.S. Mail
☐ By Overnight Mail
☐ By Facsimile
☒ By Electronic Mail:
jbender@corrcronin.com

Mary Newlin, Legal Assistant

DECLARATION OF MICHAEL R. MERRITT- 3
{S2521446; 1 }

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

# EXHIBIT 1

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

DDD, INC., a Washington corporation,

        Plaintiff,

  v.

LUX VENDING, LLC D/B/A BITCOIN DEPOT, a foreign limited liability company,

        Defendant.

NO. 23200176-32

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF

Plaintiff, DDD, Inc., by and through its attorneys of record, the law firm of Hawley Troxell Ennis & Hawley LLP, hereby complains and alleges as follows:

## I.
## PARTIES, JUSRISDICTION AND VENUE

1. At all times relevant to this action, Plaintiff, is a corporation formed pursuant to the laws of the State of Washington with its principle place of business in Spokane County, Washington.

2. Defendant, Lux Vending, LLC dba Bitcoin Depot, is a Georgia limited liability company and is registered as a foreign limited liability company under the laws of the State of Washington. Defendant does business in Spokane County, Washington.

COMPLAINT FOR FRAUD AND DECLARATORY
RELIEF- 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

3.  The agreements purportedly entered into by and between Plaintiff and Defendant were entered into in Spokane, Washington, and all representations made by and negotiations involving the Parties occurred in Spokane County, Washington.

4.  The Court has subject matter jurisdiction over this dispute.

## II.
## FACTUAL BACKGROUND

5.  Plaintiff repeats and realleges every allegation contained in paragraphs 1-4 of this Complaint is if fully set forth herein.

6.  Plaintiff was approached by representatives of Defendant in April of 2021 with Defendant seeking an agreement with Plaintiff to place Defendant's bitcoin automated teller machines in convenience stores owned and operated by Plaintiff.

7.  In May 2021, Defendant's agent met with Plaintiff and presented Plaintiff with a document entitled Kiosk Site Location Agreement. Defendant represented that the Kiosk Site Location Agreement was the Agreement that governed the placement of the ATM in Plaintiff's store. See Kiosk Site Location Agreement dated 5/18/21 attached as Exhibit 1 to this Complaint.

8.  Based upon the terms contained in the Kiosk Site Location Agreement, Plaintiff entered into the Agreement with Defendant for one of its stores located at 4615 N. Division St., Spokane, Washington by signing a Kiosk Placement Form on May 18, 2021. See executed Kiosk Placement Form dated 5/18/21 attached as Exhibit 2 to this Complaint.

COMPLAINT FOR FRAUD AND DECLARATORY
RELIEF- 2

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

9.  At the time of the signing of the Kiosk Placement Form, Defendant represented to Plaintiff that the "Location Master Agreement" referred to in the Kiosk Placement Form was the Kiosk Site Location Agreement provided to him.

10. Paragraph 12 of the Kiosk Site Location Agreement provides that:

"If the Location is sold or sells substantially all of its assets outside of the ordinary course of business, the Agreement will terminate and Location's obligations discharged so long as Location provides a document to Owner evidencing the sale such as a receipt, asset purchase agreement or bill of sale."

11. In October 2021, Plaintiff was again approached by Defendant seeking a second agreement to place one of Defendant's ATMs in another convenience store owned and operated by Plaintiff and located at 3812 E. Highland Rd., Mead, Washington.

12. As to this second ATM agreement proposed by Defendant, Plaintiff expressly asked and Defendant represented that the same terms governed this agreement as the Agreement entered into by the parties on 5/18/21.

13. Based upon Defendant's representations regarding the terms of the Agreement, Plaintiff signed another Kiosk Placement Form dated 10/29/21. See Kiosk Placement Form dated 10/29/21 attached as Exhibit 3 to this Complaint.

14. Thereafter, in October 2022, Plaintiff entered into an agreement to sell the convenience stores where Defendant had placed its ATMs.

15. During the process of selling its stores, Plaintiff sent the required notice of the sale of the stores pursuant to the terms of the Agreement to Defendant to terminate the Agreement entered into by the Parties.

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF- 3

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

16. In response to Plaintiff's notice of termination of the Agreement, Defendant refused to allow the Agreement to be terminated citing provisions of an agreement that had never been provided to Plaintiff and which Plaintiff had never seen. See Location Master Agreement terms attached hereto as Exhibit 4 to this Complaint.

17. Defendant then asserted that the terms of the new Location Master Agreement governed the relationship between the parties and refused to terminate the agreement.

18. Based on the terms of the new Location Master Agreement, Defendant also made a significant monetary demand to Plaintiff for payment of money Defendant expected to be paid based on the continued placement of the ATMs in Plaintiff's stores.

19. There was no meeting of the minds, mutual understanding of, or mutual assent to the materials terms of the Agreement the Parties purportedly entered into related to the placement of Defendant's ATMs in Plaintiff's stores.

20. A dispute has arisen between the Parties regarding the materials terms of the Agreement the Parties entered into related to the placement of Defendant's ATMs in Plaintiff's stores.

### III.
### FIRST CAUSE OF ACTION
**(Intentional Misrepresentation - Fraud)**

21. Plaintiff repeats and realleges every allegation contained in paragraphs 1-20 of this Complaint is if fully set forth herein.

COMPLAINT FOR FRAUD AND DECLARATORY
RELIEF- 4

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

22. Defendant sought to obtain Plaintiff's agreement to place its ATMs in Plaintiff's stores, and to induce Plaintiff to agree to this, Defendant made material misrepresentations about the terms of the proposed agreement.

23. On or about May 18, 2021, Defendant approached Plaintiff about placing its ATM inside of Plaintiff's store. To induce Plaintiff to enter into the Agreement, Defendant provided the Kiosk Site Location Agreement and represented that these were terms which governed the contract between the Parties regarding the placement of Defendant's ATM in Plaintiff's store.

24. The Kiosk Site Location Agreement allows for termination of the Agreement without penalty if Plaintiff's store is sold. Plaintiff specifically relied on the terms of the Agreement as represented to it in deciding whether to enter into the Agreement.

25. On or about October 29, 2021, Defendant sought to obtain a second agreement from Plaintiff to place another of its ATMs in a second store owned by Plaintiff. Defendant induced Plaintiff to enter into the Agreement by expressly representing that the terms of the agreement for the second ATM placement were the same as those set forth in the May 18, 2021 Kiosk Site Location Agreement.

26. Over a year after Plaintiff executed the first Agreement, Defendant claimed that the Kiosk Site Location Agreement was not the Agreement Plaintiff had entered into and that a new Location Master Agreement governed the relationship between the Parties. Defendant asserts that this new agreement did not allow a termination of the Agreement if the stores were sold, and Defendant made demand for all of the profits

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF- 5

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

Page 9

it alleges it would have earned if the Agreement was in force for the entire term of the Agreement.

27. Defendant made intentional and fraudulent misrepresentations regarding the terms of the Agreement governing the placement of Defendant's ATMs in Plaintiff's stores to induce Plaintiff to enter into the agreements.

28. Defendant's intentional and fraudulent misrepresentations have caused Plaintiff significant damage.

29. Plaintiff has been forced to retain an attorney to address Defendants fraud by filing this action, and is entitled to its attorney's fees and costs expended in prosecuting this action.

IV.
## SECOND CAUSE OF ACTION
### (Declaratory Relief)

30. Plaintiff repeats and realleges every allegations contained in paragraphs 1-29 of this Complaint is if fully set forth herein.

31. RCW 7.24, et seq. provides the Superior Court with the authority to declare rights, status and other legal relations under contracts and instruments. An active controversy exists as to the Parties' rights and interests under the Agreements that are the subject of this action.

32. Plaintiff seeks a declaratory ruling from this Court finding that the Agreements are invalid and unenforceable as there was no meeting of the minds regarding the terms of the Agreements that is required to form an agreement between the Parties.

COMPLAINT FOR FRAUD AND DECLARATORY RELIEF- 6

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

33. Plaintiff has been forced to retain an attorney to address Defendant's fraud by filing this action, and is entitled to its attorney's fees and costs expended in prosecuting this action

## V.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For a judgment in favor of Plaintiff declaring any alleged Agreement between the Parties invalid and unenforceable;

2. Compensatory damages for the fraud committed by Defendant;

3. Punitive damages against Defendant for the fraud committed by Defendant;

4. For prejudgment interest and post judgment interest as provided by applicable law;

5. For attorney's fees and costs as provided under by Agreement and pursuant to Washington law;

6. For such other and further relief as the Court may deem just and proper.

DATED this 17th day of January, 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By: _____

MICHAEL R. MERRITT, WSBA #60094
Counsel for Plaintiff

COMPLAINT FOR FRAUD AND DECLARATORY
RELIEF- 7

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

EXHIBIT 1

Kiosk Site Location Agreement

This Kiosk Site Location Agreement (the "Agreement") is made and entered into effect _5⁻/8⁻2021_ (the "Effective Date") by and between Lux Vending, LLC ("Owner"), and _Non TH To w n Chenron_ ("Location")

1. **Equipment:** Owner owns kiosks that facilitate the purchase and sale of virtual currency and owns or has the right to use all software needed for the operation of the kiosk (the "Kiosk"). Location agrees that Owner may install, operate, and maintain its Kiosk at Location's premises identified in Exhibit "1" attached hereto (the "Premises"). The Kiosk will be installed in an indoor, mutually agreeable location on the Premises. The Kiosk will be installed to provide an unrestricted view of the Kiosk with room for signage. Location will provide sufficient space for the Kiosk as is necessary to enable customers to have unobstructed access to the Kiosk and for maintenance and servicing of the Kiosk.

2. **Availability:** Location agrees that the Kiosk shall at all times remain available for use by Location's customers during Location's normal business hours for the Term (defined below) of this Agreement. Owner reserves the right to schedule reasonable downtime to accomplish necessary maintenance or system improvements.

3. **Location Fees:** Once the Kiosk has been installed on the Premises and is fully operational for use by the public, Owner shall pay Location a fee equal to _One Hundred Fifty_ dollars and zero cents (\$_150.00_) per month throughout the Term or _One Dollar Fifty_ (\$_1.50_) per transaction (the "Location Fee"). Whichever of the two payments is greater will be disbursed to the Location. For purposes of this Agreement, a transaction is defined as any sale of virtual currency where a transaction fee is collected by the Owner. The Location Fee will be disbursed monthly by Owner to Location the calendar month following the calendar month in which the Kiosk transactions occurred.

4. **Title:** Title to the Kiosk is, and shall at all times remain with the Owner. The Kiosk shall not be transferred or delivered legally or physically to any person other than Owner without prior written consent of Owner; neither shall this Agreement nor the bailment be assigned by Location, either by its own acts or by operation of law. In the event that any creditor of Location enters the Premises for the purpose of taking possession of Location's separate property pursuant to a security agreement, Writ of Possession, Distress Warrant or Writ of Fieri Facias, Location shall identify, designate, and exclude the Kiosk as Owner's property not subject to repossession or execution. Location shall promptly notify Owner in writing of any attempts by any creditor, landlord or third-party claimants seeking to repossess Location's separate property or seeking to execute a Writ of Possession, Distress Warrant or Writ of Fieri Facias at the Premises. Upon Owner's request, Location shall further identify any such creditors, landlords or third-party claimants to Owner. Upon request, Location shall execute and deliver documentation to put third parties on notice of Owner's ownership of the Kiosk. Notwithstanding Section 5 herein, Location acknowledges that the Kiosk is not a fixture of the Premises and Location shall undertake all necessary steps to ensure that the Kiosk does not become a fixture of the Premises. Except as otherwise provided in this Agreement, all cash kept in the Kiosk shall be the property of Owner.

1

5. <u>Installation/Training:</u> Owner agrees to ship and install the Kiosk at the Premises, train Location's staff as necessary, and deliver initial supplies to Location. Subject to the terms and provisions of Section 4 herein, Owner shall have the right to bolt down the Kiosk and install appropriate signage at the Premises to advertise the availability of the Kiosk.

6. <u>Maintenance/Repair:</u> Owner, at its expense, will arrange for necessary servicing and repair of the Kiosk. In the event of any Kiosk failure, damage, or other problem requiring repair, replacement, adjustment, or maintenance, Location shall notify Owner, or a person designated by Owner, within twenty-four (24) hours of first becoming aware of such failure, damage, or problem. Location will not permit anyone, other than an authorized representative or designee of Owner, to perform any service or repair work on the Kiosk without Owner's prior written approval. Owner or its representatives shall, at any reasonable time and at all times during business hours, have the right to enter into and upon the Premises for the purpose of inspecting, repairing, maintaining, or upgrading the Kiosk and observing its use. Location shall cooperate in allowing Owner to perform maintenance, service, updates, or repairs that can be performed by remote communication. Owner, or Owner's agents, shall replace paper in the Kiosk when necessary and shall correct any misfeeds. Location shall maintain the space surrounding the Kiosk in a safe, neat, and orderly condition.

7. <u>Inventory Requirements:</u> Owner or Owner's agents shall maintain inventory of an adequate supply of paper and Bitcoin for the Kiosk. Owner shall keep sufficient amounts of cash in the Kiosk at all times during Location's normal business hours if the Kiosk dispenses cash.

8. <u>Internet & Electrical Requirements:</u> Location can choose to provide and maintain a dedicated business Ethernet or Wi-Fi connection for the Kiosk or Location may require the Owner to provide a wireless connection for the Kiosk. Location shall, at its expense, provide one (1) dedicated operating electrical power outlet (110v). Both the internet connection and the electrical power outlet shall be located within two (2) feet of the Kiosk site, or an extension cord shall be provided by Location. Location shall pay for all expenses incurred for an internet connection if Location provides an ethernet connection for the Kiosk. Location shall pay for all expenses incurred in connection with electrical power usage necessary to operate the Kiosk and related signage. Location shall not interfere with the Kiosk's electrical or internet connectivity for duration of the Agreement and Location shall not disconnect or deactivate the Kiosk or allow the Kiosk to be disconnected or deactivated. If the Kiosk remains disconnected or deactivated after Owner provides written notice, Owner will be excused from paying the Location Fee for so long as the Kiosk remains disconnected or deactivated and Location shall be liable to Owner for a "Disconnection Fee" in the amount of One Hundred ($100.00) for each day the Kiosk remains disconnected or deactivated. The Parties acknowledge and agree that the Disconnection Fee is not a penalty but is instead intended to be liquidated damages. The Parties agree and acknowledge that Owner's damages would be difficult to estimate upon disconnection or deactivation of the Kiosk but that One Hundred Dollars per day ($100.00) is a reasonable method of calculating Owner's damages and the Parties agree that this

2

provision should be read as liquidated damages rather than a penalty. Location's liability for the Disconnection Fee will continue during the Term for so long as the Kiosk remains disconnected or deactivated. Owner may retrieve the Kiosk for purposes of safe keeping, but Owner's acceptance of the Kiosk will not discharge Location of its obligation to pay the Disconnection Fee. Location agrees to pay Owner's reasonable attorney's fees and expenses of litigation in the event Owner engages counsel to collect the Disconnection Fee. Notwithstanding the foregoing, the Disconnection Fee shall not apply to interference directly resulting from power outages beyond the reasonable control of the Location and/or an agent or party acting on behalf of the Location.

9. **Exclusivity; Competitors:**

   9.1    Location shall not permit the removal of the Kiosk from the Premises for the duration of the Term.

   9.2    Location shall not enter into an agreement with any Competitor or allow the placement of a Competitor's kiosk on the Premises (whether inside or outside the Premises) or anywhere on the underlying real property on which the Premises are located, nor subscribe to any processing service for the purchase or sale of virtual currency on the Premises that may compete with the Owner's Kiosk during the term of this Agreement. For purposes of this Agreement, "Competitor" means any person or entity that trades virtual currency; owns or operates digital currency kiosks; or conducts, authorizes, offers or provides services and products of the type conducted, authorized, offered or provided by Bitcoin Depot during the term of this Agreement or any person or entity that facilitates the purchase or sale of digital currency.

   9.3    Location agrees that Owner shall have the exclusive right to provide digital currency kiosks or any terminal that can conduct and/or execute digital currency transactions to Location and to all other business sites occupied (including by way of ownership, lease or sublease) by Location.

   9.4    If Location violates this Agreement by entering into an agreement with a Competitor and fails to cure such violation within ten (10) days after receipt of Owner's notice of the violation, Owner shall have all remedies provided by law.

   9.5    Location's obligations under this Section 9 have been assumed as an accommodation to Owner and as a material inducement to Owner to enter into this Agreement. Any breach of Location's obligations under this Section 9 shall be deemed a material breach of this Agreement. The Parties agree that Location's breach of this exclusivity agreement would cause irreparable damage to Owner and monetary damages would provide inadequate remedy to Owner. Owner will be entitled to seek temporary and permanent injunctive relief to prohibit additional violations of this exclusivity agreement in addition to seeking any award of damages for such violation.

3

10. **Protection Requirements:** Location shall exercise due care for the safekeeping and maintenance of the Kiosk. Location shall not be held liable for damage, theft or loss of the Kiosk except in cases of fraud, gross negligence, or intentional malfeasance by the Location. Owner shall have no liability to Location in the event of theft, damage or loss caused by the Kiosk.

11. **Ownership of Premises or Lease Term(s):** Location represents and warrants that it is the owner of the Premises or that it holds a lease or option to renew a lease of the Premises of equal or greater length than the Initial Term (as defined below) of this Agreement. If Location leases the premises, the Location shall notify Owner of any dispossessory or distress proceedings initiated against Location or the Premises within twenty-four (24) hours of being served with process of the dispossessory or distress proceedings. In the event that dispossessory or distress proceedings are initiated against Location, Owner has the right to terminate this Agreement and reclaim possession of the Kiosk.

12. **Relocation; Sale; Expansion:** In the event Location transfers or moves its business from the Premises, expands its business to additional sites, or if Location sells its business or substantially all of its assets, Location shall provide Owner with at least sixty (60) days' advance written notice of such occurrence (or as much notice as reasonably practicable) ("Location's Notice"). Owner shall have the exclusive option to install an additional Kiosk at the Location's (or its successor in interest's) new business site(s) along the same terms and conditions set forth in this Agreement (the "Option"); and Owner may exercise its Option by delivering written notice of its intent to exercise its Option within thirty (30) days from its receipt of Location's Notice. Location agrees that, in the event of transfer, move or sale of Location's business, this Agreement remains in full force and effect as to the Location's new business site(s) and Exhibit **"1"** shall be deemed amended so that the Premises shall include the Location's new business site(s). If the Location is sold or sells substantially all of its assets outside the ordinary course of business, this Agreement will terminate and Location's obligations discharged so long as Location provides a document to Owner evidencing the sale such as a receipt, asset purchase agreement or bill of sale.

13. **Term:** This Agreement shall be for a term *seven* (7) years from the date of installation of the Kiosk at the Premises, unless amended or terminated by written agreement signed by both Owner and Location, or terminated as set forth below (the "Initial Term"). Upon the expiration of the Initial Term, this Agreement will automatically renew for subsequent additional terms of *seven* (7) years each on the same terms and conditions as provided herein unless canceled by written notice at least ninety (90) days prior to expiration of the then current term (the Initial Term, as extended, the "Term").

14. **Termination:** Upon the occurrence of a breach, either party may terminate this Agreement effective ten (10) days after giving written notice of intent to terminate, provided that such breach continues for ten (10) days after notice of such breach. Either party may terminate this Agreement in accordance with the terms and provisions of Section 13. In addition, Owner may terminate this Agreement upon giving thirty (30) days prior written notice to Location. Owner has the right to terminate this Agreement immediately in the event of damage, destruction, vandalism, misuse, loss, or the Owner, in good faith, believes that the

4

Kiosk is at risk for damage, destruction, vandalism, misuse or loss. Even if the Agreement is terminated, Location's obligation to pay a Disconnection Fee shall survive for the duration of the length of the Term. In the event the Agreement is terminated, Owner may declare all Disconnection Fees due for the length of the Term immediately due and payable so long as the Owner discounts the future Disconnection Fees to a net present value using the Wall Street Journal's Prime Rate.

All notices hereunder shall be in writing and shall be deemed given upon personal delivery or upon deposit in the United States certified mail, return receipt requested, with postage paid or by overnight receipted courier service, addressed to Owner and Location at their respective addresses as listed below. Any party may change its address for notice in accordance with the terms of this paragraph.

15. **Disclaimer:** EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, LOCATION UNDERSTANDS AND AGREES THAT OWNER MAKES NO WARRANTY, EXPRESS, IMPLIED, OR STATUTORY AS TO ANY MATTER WHATSOEVER, INCLUDING THE CONDITION OF THE KIOSK, ITS MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE. OWNER SHALL IN NO EVENT BE RESPONSIBLE FOR ANY LOST PROFITS OR INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR INDIRECT DAMAGES THAT LOCATION MAY INCUR. OWNER'S SOLE LIABILITY TO LOCATION HEREUNDER, EXCEPT AS OTHERWISE PROVIDED, SHALL BE TO REMEDY ANY BREACH OF THIS AGREEMENT IN A TIMELY MANNER. NEITHER PARTY WILL BE LIABLE FOR FAILURE TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT IF SUCH FAILURE IS DUE TO ACTS OR EVENTS BEYOND SUCH PARTY'S REASONABLE CONTROL.

16. **Not Assignable:** Location shall not assign or dispose of any of its rights or obligations under this agreement without prior written consent of Owner. This agreement is binding on the successors and permitted assigns of the parties.

17. **Waiver:** A waiver by either party of a breach of any provision of this Agreement shall not constitute a waiver of that party's rights to otherwise demand strict compliance with this Agreement and any and all provisions hereof.

18. **Arbitration:** Except as specified in this Section 18, any dispute, controversy, or claim arising out of or relating to this Agreement or the breach, termination or validity of this Agreement will be submitted to arbitration as prescribed herein. The parties will agree on a single arbitrator within thirty (30) days of receipt of a notice of intent to arbitrate. Such arbitrator will be knowledgeable about the ATM industry and will conduct the arbitration under the current Commercial Arbitration rules of the American Arbitration Association ("AAA"), unless otherwise provided herein. The arbitrator will be selected in accordance with AAA procedures from a list of qualified people maintained by AAA. The arbitration will be conducted in Atlanta, Georgia. The arbitrator's decision and award will be final and binding, and judgement upon the award rendered by the arbitrator may be entered in any

court having jurisdiction thereon. Any duty to arbitrate under this Agreement will remain in effect and enforceable after termination of this Agreement for any reason.

19. **Entire Agreement:** This Agreement, including any schedule or exhibit attached hereto, constitutes the entire agreement of the parties with respect to the subject matter hereof. There are no other promises, representations, terms, conditions, or obligations other than those contained herein. This agreement supersedes all prior communications, representations or agreements, oral or written, between the parties and shall not be modified except in writing signed by both parties.

20. **Controlling Law:** This Agreement shall be construed, interpreted, and enforced in accordance with the laws of the State of Georgia, without regard to its conflict of law principles. The jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in Fulton County, Georgia or any county where Owner (or its successor in interest) maintains its principal place of business or residence.

21. **Counterparts:** This Agreement may be executed in counterparts and exchanged via email transmission. Each email transmitted counterpart (including pdf) bearing a signature shall be an original for all purposes and all such counterparts shall constitute one and the same agreement.

22. **Third-Party Beneficiaries**. There shall be no Third-Party Beneficiaries to this agreement.

6

EXHIBIT 2

## Kiosk Placement Form

| Location Legal Entity: DDD, Inc. | Effective Date: 5-18-2081 |
|---|---|
| Location DBA Name: NorthTown Chevron | Pacific distributing |
| Phone: 509-489-9039 | Distributor Name (Entity and DBA): 0 |
| Email: bdive1@msn.com | Phone: 1-800-548-1913 |
| Address to be used for payment: 4615 N. Division St Spokane, WA. 99207 | Email: pacificdistributing.96@r Sales Contact: gmail.com Mark Smith 770 670 9095 mark@bitcoindepot.com |
| Tenant or Landlord? Tenant | |
| If Tenant, lease end date: 12/31/2039 | |
| Term: 7~ Years | |

| Premises [Put full address of store] | Additional Entity (if applicable) | Per Trans. Fee | Flat Fee: |
|---|---|---|---|
| 4615 North Division Spokane, WA 99207 | | 1.50 | 150.00 |
| | | | |
| | | | |

By signing below, Location and Bitcoin Depot expressly agree to be bound by all of the terms and conditions of the Location Master Agreement located at get.bitcoindepot.com/LMA or such other URL or address as provided by Bitcoin Depot from time to time ("LMA"), which is hereby incorporated by reference. Capitalized terms shall have the meaning set forth in the LMA. Location acknowledges and agrees that it has read and understands the terms set forth in the LMA and that all information in this Kiosk Placement Form is accurate and complete.

Owner:

Signed: _Landon Thomas_ (DocuSigned by Landon Thomas 7F00E00E71384AA)

Lux Vending, LLC d/b/a Bitcoin Depot
2870 Peachtree Rd #327
Atlanta, Georgia, 30305

Name: _____

Location:

Signed: X _____

Name: _Robert A. Overhiss_

Title: _President_

Address: _40302 Northshore Dr._
_Loon Lake, WA. 99148_

# EXHIBIT 2

## FORTSON, BENTLEY AND GRIFFIN, P.A.

ELBERT N. WHITMIRE, III, C.P.A.
G. MARCUS HODGE (GA & SC)
DAVID K. LINDER
ROY E. MANOLL, III
WALTER W. HAYS, JR.
MICHAEL J. MCCLEARY
V. KEVIN LANG
TREVOR T. JONES (GA & AL)
BRICKER S. DAUGHTRY
DAVID F. ELLISON
WADE A. SCHUENEMAN
GREGORY O. DEBACKER
PARKER C. MORGAN
ELINORE R. YOUNG

ATTORNEYS AT LAW
2500 DANIELL'S BRIDGE ROAD
BUILDING 200, SUITE 3A
ATHENS, GEORGIA 30606

(706) 548-1151

CHRISTOPHER W. COLLINS
EMILY K ESCOE
LINDSEY B WOODARD
ABBEY J. DUHÉ
JOHNELLE SIMPSON, II
HANNA C. SCHERER

UPSHAW C. BENTLEY, JR.
(1924 – 2013)
EDWIN B. FORTSON
(1913-2007)
JOHN E. GRIFFIN
(1923-2002)
HERBERT T. HUTTO
(1933-1998)

January 23, 2023

*VIA FEDERAL EXPRESS: 7710 9628 4213*
*AND EMAIL: MMerritt@hawleytroxell.com*

Michael R. Merritt
Hawley Troxell Ennis & Hawley, LLO
422 W. Riverside Ave, Suite 1100
Spokane, Washington 99201

   Re: DDD, Inc. v. Lux Vending, LLC d/b/a Bitcoin Depot

Dear Mr. Merritt:

  Our firm represents Lux Vending, LLC d/b/a Bitcoin Depot, and we are in receipt of a Complaint recently filed in the Superior Court Spokane County, in the State of Washington (Case No. 232000176-32).

  I send this correspondence to provide notice of Lux Vending, LLC's intent to arbitrate the dispute, controversy and claims between the parties in accordance with the Commercial Arbitration rules of the American Arbitration Association ("AAA"). Lux Vending, LLC proposes that the parties agree upon a single arbitrator chosen from a list 10 names from AAA's National Roster.

  Although Lux Vending, LLC denies the allegations of DDD, Inc.'s Complaint, there should be no controversy as to the existence of a written agreement to arbitrate because the contract that DDD, Inc. seeks to enforce contains an arbitration clause. Therefore, Lux Vending, LLC demands that DDD, Inc. immediately dismiss this action so that the Parties may submit this dispute to arbitration with AAA in Atlanta, Georgia. If DDD, Inc. refuses to dismiss its action, Lux Vending, LLC will have the right as an aggrieved party to obtain a court order compelling arbitration.

01322853.1/020464-000032

FORTSON, BENTLEY AND GRIFFIN
A PROFESSIONAL ASSOCIATION

Michael R. Merritt
Hawley Troxell Ennis & Hawley, LLO
January 23, 2023
Page 2

In the event litigation is required to enforce this arbitration provision, Lux Vending, LLC intends to recover all attorney's fees and expenses incurred in obtaining such an order.  Therefore, please take this opportunity to resolve this matter amicably by immediately dismissing DDD, Inc.'s pending action in the Superior Court of Spokane County.

Thank you for your prompt attention to this matter. In the meantime, my client reserves all rights and remedies provided by law.

Sincerely,

FORTSON, BENTLEY AND GRIFFIN, P.A.

David F. Ellison

cc.
Branden Tawil, Esq.  <branden.tawil@bitcoindepot.com>

01322853.1/020464-000012

# EXHIBIT 3

## FORTSON, BENTLEY AND GRIFFIN, P.A.

ELBERT N. WHITMIRE, III, C.P.A.
G. MARCUS HODGE (GA & SC)
DAVID K. LINDER
ROY E. MANOLL, III
WALTER W. HAYS, JR.
MICHAEL J. MCCLEARY
V. KEVIN LANG
TREVOR T. JONES (GA & AL)
BRICKER S. DAUGHTRY
DAVID F. ELLISON
WADE A. SCHUENEMAN
GREGORY O. DEBACKER
PARKER C. MORGAN
ELINORE R. YOUNG

ATTORNEYS AT LAW
2500 DANIELL'S BRIDGE ROAD
BUILDING 200, SUITE 3A
ATHENS, GEORGIA 30606

(706) 548-1151

CHRISTOPHER W. COLLINS
EMILY K. ESCOE
LINDSEY B. WOODARD
ABBEY J. DUHÉ
JOHNELLE SIMPSON, II
HANNA C. SCHERER

UPSHAW C. BENTLEY, JR
(1924 - 2013)
EDWIN B. FORTSON
(1913-2007)
JOHN E. GRIFFIN
(1923-2002)
HERBERT T. HUTTO
(1933-1998)

February 1, 2023

*VIA FEDERAL EXPRESS: 7711 8705 4246*
*AND EMAIL: MMerritt@hawleytroxell.com*

Michael R. Merritt
Hawley Troxell Ennis & Hawley, LLO
422 W. Riverside Ave, Suite 1100
Spokane, Washington 99201

      Re:    DDD, Inc. v. Lux Vending, LLC d/b/a Bitcoin Depot

Dear Mr. Merritt:

As you are aware, our firm represents Lux Vending, LLC d/b/a Bitcoin Depot, and I send this correspondence in regard to the Complaint filed by DDD, Inc., in the Superior Court Spokane County, in the State of Washington (Case No. 232000176-32) against Lux Vending, LLC.

On January 23, 2023, Lux Vending, LLC delivered notice of intent to arbitrate this dispute pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), and demanded that DDD, Inc. dismiss its state court action in Washington so that this dispute may be submitted to AAA. Since then, however, it appears that DDD, Inc., has continued with the prosecution of its claims against Lux Vending, LLC in the Superior Court of Spokane County, Washington, and that it has filed a Motion for Declaratory Relief with a hearing scheduled on April 14, 2023.

Please accept this correspondence as a final request and demand that DDD, Inc. submit this dispute to arbitration. If DDD, Inc. does not stay or dismiss this action within five (5) days, Lux Vending, LLC will file a Petition to Compel Arbitration in the Northern District of Georgia. Please be aware that DDD, Inc. has consented to the jurisdiction of such venue, and that Lux Vending, LLC's damages caused by DDD, Inc.'s breach exceed $75,000.

01330246.1/020464-000012

FORTSON, BENTLEY AND GRIFFIN
A PROFESSIONAL ASSOCIATION

Michael R. Merritt
Hawley Troxell Ennis & Hawley, LLO
February 1, 2023
Page 2

Thank you for your prompt attention to this matter. In the meantime, my client reserves all rights and remedies provided by law.

Sincerely,

FORTSON, BENTLEY AND GRIFFIN, P.A.

David F. Ellison

cc.
Branden Tawil, Esq.  <branden.tawil@bitcoindepot.com>

01330246.1/020464-000012

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

DDD, INC., a Washington corporation,

        Plaintiff,

   v.

LUX VENDING, LLC D/B/A BITCOIN
DEPOT, a foreign limited liability company,

        Defendant.

NO. 23-2-00176-32

**MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION**

I.    **STATEMENT OF FACTS**

    Plaintiff recently filed a Motion for Declaratory Relief in this action with a much more detailed and extensive statement of facts, which sets forth the facts that are key to the dispute that is the subject of this action. Plaintiff also attached documentary evidence supporting the statement of facts. Rather than burden the record by restating everything that was set forth in the Motion for Declaratory Relief here, Plaintiff incorporates by reference the statement of facts in the Motion and the Declaration of Robert Divelbiss with the attached exhibits as though fully set forth herein to afford context to the current Motion. A brief summary of the current dispute follows below in this factual statement.

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

Defendant sought an agreement from DDD to allow it to place Defendant's bitcoin ATMs in two of DDD's convenience stores. DDD was induced to enter into a written agreement for the placement of the ATMs in its stores by false representations made by Defendant regarding the nature and extent of the terms of the proposed agreement. The agreement terms that Defendant presented to DDD to induce it to enter into the agreement (the Kiosk Location Agreement) included a termination clause, which allowed DDD to terminate the agreement, without penalty, if DDD sold the store in which Defendant's ATM is located. Based on the representations made by Defendant, that the Kiosk Location Agreement was the agreement governing the relationship of the parties, DDD agreed to place Defendants ATMs in two of its stores.

Approximately one year after Robert Divelbiss, the President of DDD, signed what he thought was the agreement of the parties (one agreement for each store), DDD decided to sell its stores located in Spokane, Washington. DDD notified Defendant of the sale transaction, and the closing date and requested the agreements be terminated. DDD reminded Defendant of the substance of the termination clause in the agreement that was presented to DDD by the Defendant, and sought confirmation that no termination fees would be demanded of DDD incident to the sale of its stores. During the sale transaction, DDD was assured by Defendant multiple times that no such fees would be sought. After the close of the sale transaction of DDD's stores, Defendant reversed its position entirely based upon the termination clause in an agreement called the Master Location Agreement, and demanded DDD pay termination fees based upon the terms of the Agreement, which DDD had never before seen or reviewed.

Thereafter, an attempt was made by DDD to resolve the dispute, which was unsuccessful. Thereafter, DDD filed the Complaint for Declaratory Relief and for Fraud

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 2

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

challenging the existence of any written agreement between the parties.[1]  DDD contends in its

Complaint that there was fraud in the formation of the Agreements Defendant contends exist

between the parties or at the very least, there was never a meeting of the minds or mutual assent

to the terms of the Agreements.  DDD asserts that a contract was never formed and the only

agreement governing the parties' relationship is an oral agreement with terms manifested by the

parties' performance. Accordingly, the only terms governing the agreement between the parties

include the placement of the ATMs in two of DDD's stores, and Defendant paying rent to DDD

for the privilege of doing so.

DDD filed its Complaint in the Spokane County Superior Court on January 17, 2023 for

several reasons.  Because the formation of written agreements between the parties never

occurred due to Defendant's fraud, the terms in Defendant's written agreements are

unenforceable.  This means the choice of law, choice of venue and arbitration term in the terms

of the Master Location Agreement are inapplicable to this dispute until a court of competent

jurisdiction determines that such an agreement was formed in this instance.  The purported

agreements were signed in the State of Washington, and Defendant's ATMs were placed in

DDD's stores located in Spokane, Washington.  All acts of performance by the parties took

place in Spokane, Washington. As such, the proper venue to challenge the formation of the

fraudulent agreements can only be Spokane, Washington.

After the Complaint was filed and served, on January 23, 2023, Defendant then sent

correspondence by Defendant demanding arbitration of the current dispute in Georgia based

---

[1] See Complaint attached hereto as Exhibit 1.

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 3

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

upon a choice of law term and an arbitration term in the Master Location Agreement.[2] Disputing the formation of any written agreement with Defendant, DDD filed the Motion for Declaratory Relief on January 31, 2023.  In response to the Motion being filed, Defendant sent another letter dated February 1, 2023 demanding arbitration and stating its intent to file a petition to force DDD into arbitration in the United States District Court, Northern District of Georgia.[3]

Defendant is intending to subvert the authority of this Court by collaterally attacking 1) this case, 2) this Court's jurisdiction, and 3) Plaintiff's ability to obtain an order form this Court determining whether a contract exists by filing an action to force arbitration in Georgia federal court.  However, DDD cannot be forced to litigate in Georgia until after a court of competent jurisdiction determines whether the Master Location Agreement was formed as a contract between the parties, and that the Master Location Agreement terms govern the parties' duties and obligation with respect to this dispute.

As such, Plaintiff moves this Court for an order issuing a preliminary injunction against Defendant prohibiting it from instituting litigation against DDD in a foreign jurisdiction related to the current dispute until this Court determines the contractual rights of the parties with respect to this dispute.

DDD has no contacts business or otherwise with Georgia.  No Georgia court, state or federal, has personal jurisdiction over DDD, but for the choice of law term in a contract that DDD never agreed to enter into.  To allow Defendant to institute an action in Georgia to

---

[2] See Letter dated 1/23/23 attached as Exhibit 2.
[3] See Letter dated 2/1/23 attached as Exhibit 3.

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 4

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

collaterally attack this Court's jurisdiction presumes the enforceability of the Master Location Agreement, which is the issue which is at the very heart of the current action. The question of the enforceability of the Master Location Agreement must be answered by this Court before any litigation in Georgia may be required of DDD.

Accordingly, DDD seeks an order from this Court enjoining Defendant from commencing any litigation in a foreign jurisdiction collaterally attacking or interfering with these proceedings.

## II.    LEGAL ARGUMENT

### A. Preliminary Injunction Standard

This Court is authorized by statute and court rule to enter a Preliminary Injunction.[4] "A preliminary injunction serves the same general purpose as a temporary restraining order to preserve the status quo until the trial court can conduct a full hearing on the merits."[5]

---

[4] CR 65(a); RCW 7.40.010 ("Restraining orders and injunctions may be granted by the superior court"); RCW 42.56.540.
[5] *N.W. Gas Ass'n v. Washington Utilities & Transp. Comm'n,* 141 Wn. App. 98, 115-16, 168 P.3d 443, 446 (2007).

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 5

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

A party seeking preliminary injunctive relief typically must establish (1) a clear legal or equitable right, (2) a well-grounded fear of immediate invasion of that right, and (3) that the acts complained of either have or will result in actual and substantial injury.[6] To establish the existence of a clear legal or equitable right, the moving party must show that it is likely to prevail on the merits.[7]

However, ordinarily, when assessing an application for preliminary anti-suit injunction, the Court does not assess the likelihood of success on the merits of the request made in the underlying action because when a preliminary injunction is also a foreign anti-suit injunction, the likelihood of success aspect of the traditional preliminary injunction test is replaced by the test enunciated in *E. & J. Gallo Winery v. Andina Licores S.A.*[8] The Court in the *Gallo* opinion held that to the extent the traditional preliminary injunction test is appropriate, we only need address whether the party seeking the injunction showed a significant likelihood of success on the merits by determining whether the movant has demonstrated that the factors specific to an anti-suit injunction weigh in favor of granting that injunction.[9]

**B. The Priority of Action Rule**

Anti-suit injunctions have been an accepted part of the law of Washington for many years. In *Rader v. Stubblefield*, the Washington Supreme Court held that a citizen of this state can be enjoined from prosecuting an action in another state against a citizen of this state, upon a

---

[6] See *San Juan Cnty. v. No New Gas Tax*, 160 Wash. 2d 141, 153, 157 P.3d 831, 837 (2007) (citing *Wash. Fed'n of State Employees v. State*, 99 Wash.2d 878, 888, 665 P.2d 1337 (1983)).
[7] See *San Juan Cnty.*, 160 Wash. 2d at 154, 157 P.3d at 837 (citing *Rabon v. City of Seattle*, 135 Wash.2d 278, 285, 957 P.2d 621, 624 (1998)).
[8] See *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 883-884 (9th Cir. 2012); See also *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984 (9th Cir.2006)
[9] See *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990 (9th Cir.2006)

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 6

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

proper showing of the facts, and any such injunction is not an attempt to control the action of a foreign court.[10]

One manner in which later courts have conceptualized this notion is the Priority of Action Rule.  The Priority of Action Rule is a principle that courts use to avoid unseemly and expensive jurisdictional conflicts.[11]  The Rule provides that the first court to obtain jurisdiction over a case possesses exclusive jurisdiction to the exclusion of other courts.[12]

In *Am. Mobile Homes, Inc. v. Seattle–First Nat'l Bank*, the Washington Supreme Court explained the operation of the Priority of Action Rule *as follows:*

> "[i]t is an accepted principle that, when a court of competent jurisdiction has become possessed of a case, its authority continues, subject only to the appellate authority, until the matter is finally and completely disposed of, and no court of co-ordinate authority is at liberty to interfere with its action."[13]

The Court further explained the Rule as follows:

> [T]he court which first gains jurisdiction of a cause retains the exclusive authority to deal with the action until the controversy is resolved. The reason for the doctrine is that it tends to prevent unseemly, expensive, and dangerous conflicts of jurisdiction and of process.[14]

---

[10] See *Rader v. Stubblefield*, 43 Wash. 334, 86 P. 560 (1906); see also *Northern Pac. Ry. Co. v. Richey & Gilbert Co.*, 132 Wash. 526, 527, 232 P. 355, 356 (1925)
[11] See *Atlantic Casualty Insurance Co. v., Oregon Mutual Insurance Co.*, 137 Wash.App 296, 302, 153 P.3d 211, 214 (2007); see also *Am. Mobile Homes, Inc. v. Seattle–First Nat'l Bank*, 115 Wash.2d 307, 317, 796 P.2d 1276 (1990) (citing *Sherwin v. Arveson*, 96 Wash.2d 77, 80, 633 P.2d 1335 (1981)).
[12] *Id.*
[13] See *Am. Mobile Homes, Inc. v. Seattle–First Nat'l Bank*, 115 Wash.2d 307, 316-317, 796 P.2d 1276, 1282 (1990) (quoting *State ex rel. Greenberger v. Superior Court*, 134 Wash. 400, 401, 235 P. 957 (1925).
[14] *Id.* (quoting *Sherwin v. Arveson*, 96 Wash.2d 77, 80, 633 P.2d 1335 (1981)).

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 7

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

The rule applies where there is identity of subject matter, relief, and parties between the two actions filed in separate jurisdictions.[15] This identity between the actions must be such that a decision in one court would, as res judicata, bar further proceedings in the other court.[16]

In *Bunch v. Nationwide Mut. Ins. Co.*, the Washington Court of Appeals stated, in its opinion, that under the Priority of Action Rule, that courts look to whether the actions share "identity" of (1) subject matter, (2) parties, and (3) relief.[17] The *Bunch* Court further noted that while the general rule looks to these three elements, these elements are not to be applied inflexibly.[18] Rather, courts have looked beyond these elements and to the policy behind the doctrine.[19] The underlying purpose of the three elements is to determine whether the "identity" of the actions is "such that a decision in one tribunal would bar proceedings in the other tribunal because of res judicata."[20]

Additionally, anti-suit inunctions are also permitted in federal court. In *Teck Metals Ltd. v. Certain Underwriters at Lloyd's, London,* the United States District Court, Eastern District of Washington heard motions on a dispute related to Teck Metal's Motion for Anti-Suit Injunction.[21] Teck's motion sought to restrain Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies ("London Insurers") from proceeding with an action filed in British Columbia and injunction motions in that action

---

[15] See *Atlantic Casualty Insurance*, 137 Wash.App at 302, 153 P.3d at 214 (citing *Am. Mobile Homes*, 115 Wash.2d at 317, 796 P.2d 1276)).

[16] *Atlantic Casualty Insurance*, 137 Wash.App at 302, 153 P.3d at 214 (citing *Yakima v. Int'l Ass'n of Fire Fighters*, 117 Wash.2d 655, 675, 818 P.2d 1076 (1991)).

[17] *Id.*

[18] See *Bunch*, 180 Wash.App. at 41-42, 321 P.3d at 269 (citing *Am. Mobile Homes*, 115 Wash.2d at 321, 796 P.2d 1276).

[19] See *Bunch*, 180 Wash.App. at 41-42, 321 P.3d at 269.

[20] *Id.*

[21] See *Teck Metals Ltd. v. Certain Underwriters at Lloyd's, London*, 2009 WL 4716037 (E.D. WA).

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

scheduled to heard, the purpose of which was to enjoin Teck from further prosecuting its claims for insurance coverage in the United States District Court, Eastern District of Washington.

The Eastern District of Washington first noted that it had the power to enjoin the parties before it.[22] The Court also found that it had a duty to protect its jurisdiction to the extent necessary to provide full justice to litigants.[23] The Court found that the relief Teck sought would not interfere with proceedings in British Columbia; it would only bar London Insurers from seeking an order enjoining Teck Metals from proceeding in the Eastern District of Washington.

The Court noted further that the Ninth Circuit had instructed that foreign litigation may be enjoined when it would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) prejudice other equitable considerations.[24] The Court held that if any of these factors are present, and "if the impact on comity is tolerable," an anti-suit injunction may be granted.[25]

The Court further held that comity ordinarily requires that courts of a separate sovereign not interfere with concurrent proceedings based on the same transitory claim.[26] In *Teck Metals*, the Court held that comity would not be offended by the injunction that Teck requested.[27]

---

[22] See *Teck Metals Ltd. v. Certain Underwriters at Lloyd's, London* at p. 2.
[23] *Id.* (citing *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 995 (9th Cir.2006)).
[24] *Teck Metals*, at p. 3 (citing *E. & J. Gallo*, 446 F.3d at 990)
[25] *Id.* (citing *E. & J. Gallo*, 446 F.3d at 991.
[26] *Id.*
[27] *Teck Metals*, at p. 4.

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 9

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

## C. Argument

Whether a written agreement between the parties exists and what the terms may be should be determined by this Court.  No court in Georgia, federal or state, has personal jurisdiction over DDD.  Before DDD can be forced to litigate in court or by arbitration in Georgia, a court of competent jurisdiction is required to determine whether an enforceable contract exists between the parties and if so, the nature and extent of the terms of that contract.

Given the fraud committed by Defendant in the formation of the agreements between the parties, DDD has a clear right to have a court determine whether a contract exists between DDD and the Defendant, and if so, the nature and extent of the governing terms.  If DDD is forced to litigate in Georgia, it could only be by presuming that fraud did not occur in the formation of the agreements between DDD and the alleged agreements at issue in this case are enforceable.  This decision nullifies any right DDD has to assert fraud and challenge the formation of the subject agreements and having the proper a court hear its request for declaratory relief.  As such, an injunction must be issued against the Defendant to stop it from commencing litigation in a foreign jurisdiction to avoid this Court reviewing the request for declaratory relief in this case.  If the requested injunction is not issued by this Court, DDD will suffer irreparable harm in that it will lose the right to challenge the formation of the alleged contracts.

With respect to the Priority of Action Rule, the current action was clearly filed first and this Court has had jurisdiction of this dispute before any other court.  The parties in the current matter would be the same parties as those in any action filed by Defendant in the Northern District of Georgia.  The subject matter of this action is DDD's request for the Court to determine the rights of the parties with respect to the agreements by the parties to allow

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 10

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

Defendant to place its bitcoin ATMs in DDD's stores. The subject of Defendant's threatened federal court action involves an attempt to enforce the venue, choice of law, and arbitration clause that are contained in written agreements that are alleged by Defendant to be enforceable. As such, it is clearly the case that if this Court rules the written agreements proposed to be controlling by Defendant are unenforceable, it would act as res judicata in any subsequent action commenced by Defendant to enforce the terms of these same agreements. As such, there is identity of subject matter between this action and the action Defendant has stated its intent to file in the Northern District of Georgia and the relief sought in each action is essentially the same.

With regard to the federal court concerns related to anti-suit injunctions, if Defendant is allowed to proceed with litigation in the Northern District of Georgia to enforce terms in the agreements, the very existence of which are being challenged in this action: 1) it will frustrate the policy of this Court to protect its jurisdiction, hear all matters on their merits, and enforce the policy behind the Priority of Action Rule, 2) it should be considered vexatious and oppressive as it is an "end run" around this Court's jurisdiction and the determinations sought by this action, 3) it threatens this Court's jurisdiction over this action and the citizens of this State and those business entities that choose to do business in this State, and 4) would prejudice DDD's right to a fair determination of this dispute by a court of competent jurisdiction.

Based on the foregoing, this Court must enjoin Defendant from instituting or proceeding with any litigation in a foreign jurisdiction seeking to enforce the terms of the agreements whose existence is in question and yet to be determined in the current action.

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 11

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

III.    **CONCLUSION**

Based on the foregoing, Plaintiff requests that this Court order an injunction that prohibits Defendant from commencing and/or proceeding with any litigation in a foreign jurisdiction regarding the enforceability of any of the contracts alleged to govern the parties duties an obligations related to the agreement by DDD that Defendant be permitted to place its bitcoin ATMs in DDD's stores.

The injunction should remain in place until this action is concluded and the rights of the respective parties with respect to this agreement is determined by this Court.

DATED this ____ day of February, 2023.

                    HAWLEY TROXELL ENNIS & HAWLEY LLP

                    By: _____
                        MICHAEL R. MERRITT, WSBA #60094
                        Counsel for DDD, Inc.

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 12

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

# CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the _16th_ day of February, 2023, the foregoing was delivered to the following persons in manner indicated:

John T. Bender
Corr Cronin LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001

☐ By Hand Delivery
☒ By U.S. Mail
☐ By Overnight Mail
☐ By Facsimile
☒ By Electronic Mail:
jbender@corrcronin.com

Mary Newlin, Legal Assistant

MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION
- 13

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

DDD, INC., a Washington corporation,

           Plaintiff,

  v.

LUX  VENDING, LLC D/B/A BITCOIN
DEPOT, a foreign limited liability company,

           Defendant.

NO. 23-2-00176-32

**MOTION FOR ORDER SHORTENING TIME**

    1.    **Relief Sought.** Plaintiff, DDD Inc., moves this Court for an order shortening time for the hearing on Plaintiff's Motion for Preliminary Injunction.  Plaintiff requests that the hearing be held no more than 30 days from the date of the filing of the Motion for Preliminary Injunction.

    2.    **Grounds.**  Defendant has stated it intent to immediately file an action in federal court in Georgia in correspondence to Plaintiff.  As such, there is some urgency in getting the Motion for Preliminary Injunction as soon as practicable by this Court.  The request for injunction should be heard before Defendant files the action or proceeds in acting on any such filing to avoid prejudice to Plaintiff.

MOTION FOR ORDER SHORTENING TIME
- 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

3.    **Basis**.  This Motion is made and based on the Memorandum of Points and Authorities in support of DDD, Inc.'s Motion for Preliminary Injunction, the Declaration of Michael R. Merritt and the exhibits attached thereto, and the papers and pleadings on file in this case.

DATED this 6th day of February, 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By: _____
      MICHAEL R. MERRITT, WSBA #60094
      Counsel for DDD, Inc.

MOTION FOR ORDER SHORTENING TIME - 2

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

# CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the ⎣9th⎦ day of February, 2023, the foregoing was delivered to the following persons in manner indicated:

John T. Bender
Corr Cronin LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001

☐ By Hand Delivery
☒ By U.S. Mail
☐ By Overnight Mail
☐ By Facsimile
☒ By Electronic Mail:
jbender@corrcronin.com


Mary Newlin, Legal Assistant

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

DDD, INC., a Washington corporation,

               Plaintiff,

    v.

LUX VENDING, LLC D/B/A BITCOIN
DEPOT, a foreign limited liability company,

               Defendant.

NO. 23-2-00176-32

**MOTION FOR PRELIMINARY INJUNCTION**

    1.    **Relief Sought.**  Plaintiff, DDD, Inc. ("DDD"), files this motion asking the Court for an order issuing an injunction against Defendant, Lux Vending, LLC dba Bitcoin Depot ("Bitcoin"), and prohibiting Defendant from commencing any action or proceeding with any action filed in a foreign court that interferes with this Court's jurisdiction with respect to this matter or bears on any of the legal or factual issues that will be addressed in this action.

    2.    **Grounds.**  In response to the current action and Plaintiff's Motion for Declaratory Relief Bitcoin has stated its intent to subvert the jurisdiction of this Court and Plaintiff's attempt to obtain the Court's determination of contractual rights of the parties

MOTION FOR PRELIMINARY INJUNCTION
- 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

through the current action by filing an action in a foreign jurisdiction seeking the same relief as the current action and based on the presumption that the agreements at issue in the current case have already been determined to be enforceable.

3.    **Basis.**  This Motion is made and based on the Memorandum of Points and Authorities submitted in support of this Motion, the Declaration of Michael R. Merritt and the exhibits attached to the Declaration, the papers and pleadings on file in this case and the argument s of counsel should this matter be heard.

DATED this 6ᵗʰ day of February, 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By: _____

MICHAEL R. MERRITT, WSBA #60094
Counsel for DDD, Inc.

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

## CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the _6th_ day of February, 2023, the foregoing was delivered to the following persons in manner indicated:

John T. Bender
Corr Cronin LLP
1015 Second Avenue, Floor 10
Seattle, WA 98104-1001

☐ By Hand Delivery
☒ By U.S. Mail
☐ By Overnight Mail
☐ By Facsimile
☒ By Electronic Mail:
jbender@corrcronin.com


_____
Mary Newlin, Legal Assistant

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF SPOKANE

DDD, INC.. a Washington corporation,

          Plaintiff,

   v.

LUX VENDING, LLC D/B/A BITCOIN
DEPOT, a foreign limited liability company,

          Defendant.

NO. 23-2-00176-32

**SUPPLEMENTAL MEMORANDUM
TO MOTION FOR DECLARATORY
RELIEF**

      Plaintiff, DDD, inc. ("DDD"), by and through its attorneys at record, the law firm of

Hawley Troxell Ennis & Hawley LLP, hereby submits this Supplemental Memorandum to its

Motion for Declaratory Relief.

I.    **INTRODUCTION**

      With Plaintiff's Motion for Declaratory Relief, Plaintiff seeks an order from this Court

voiding and declaring unenforceable any and all written agreements Plaintiff purportedly entered

into with Defendant in their entirety. For clarification, Plaintiff, in this Supplement adds the

request that the Court specifically address the unenforceability of the Agreement's terms

SUPPLEMENTAL MEMORANDUM TO MOTION
FOR DECLARATORY RELIEF
- 1

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

regarding choice of law and venue and the Agreement's arbitration term and declare them unenforceable along with the rest of the Agreement.

Additionally, Plaintiff wishes to take this opportunity to address the Court and alert the Court to the fact that Defendant is estopped from taking its current position with regard to seeking termination fees against Plaintiff.

## II.    SUPPLEMENTAL ARGUMENT

### A.  The Court Should Declare The Choice Of Law And Venue And Arbitration Terms In Defendant's Proposed Agreements Void And Unenforceable

As discussed in some detail in DDD's Memorandum in Support of Motion for Declaratory Relief, no written agreement was ever formed between the parties to this action.  Defendant presented written terms for a proposed agreement to DDD seeking to induce DDD to enter into an agreement allowing the placement of Defendant's bitcoin ATMs in DDD's stores. Based upon express representations of the nature and extent of the terms to the proposed agreement made by Defendants agent, Robert Divelbiss, President of DDD, executed what he thought was the agreement between the parties.

After DDD sold its stores, it provided a notice of termination of the Agreement to the Defendant and sought confirmation from the Defendant that no agreement termination fees would be sought by Defendant.  Through e-mail correspondence with Defendant, Defendant confirmed multiple times that no termination fees would be sought.  After the close of the sale of the DDD's stores, Defendant then contradicted its prior position on termination fees and demanded the fees be paid by DDD.

SUPPLEMENTAL MEMORANDUM TO MOTION
FOR DECLARATORY RELIEF
- 2

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

DDD incorporates herein by reference the facts and evidence, legal citations and argument contained in the Memorandum in Support of Motion for Declaratory Relief in this Supplement to support the current request for relief.

In addition to seeking the court's order voiding and declaring unenforceable all proposed written agreements argued by a Defendant to be enforceable, DDD seeks an order from this court specifically declaring void and enforceable the choice of law and venue terms and the arbitration term in Defendant's proposed agreement.

## B. Defendant Is Estopped From Demanding The Payment Of Contract Termination Fees From DDD

Bitcoin's intention to enforce the termination term in the Master Location Agreement and assertion of termination fees against DDD can be defeated affirmatively by a claim of promissory estoppel by DDD or by a defense based upon equitable estoppel. Either approach extinguishes any right Bitcoin has to enforce its demand for termination fees.

### 1. Promissory Estoppel

There are five elements that must be established to support a recovery pursuant to a claim for promissory estoppel: (1) A promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.[1]

---

[1] See *Corbit v. J. I. Case Co.*, 70 Wash.2d 522, 538-539, 424 P.2d 290, 300-301(1967); See also *Havens v. C & D Plastics, Inc.*, 124 Wash.2d 158, 172 876 P.2d 435, 442-443 (1994)

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

Mark Smith, Director of Business Development at Bitcoin, represented to DDD multiple times that Bitcoin would not pursue termination fees against DDD. DDD relied on that promise to its detriment during its due diligence period before the closing of the sale transaction for its stores. As explained above, a significant sum of money was set aside to pay for DDD's contract termination fees during the sale transaction. DDD sought an accounting of all such fees through its contacts with its vendors to allow for payment of all termination fees before the sale closed. During this process, DDD made multiple contacts with Bitcoin confirming that pursuant to the parties' contract terms, no fees would be pursued by Bitcoin against DDD. DDD relied on these representations by Bitcoin and did not utilize any of the funds made available during the sale transaction to pay for a claim for termination fees made by Bitcoin. After the sale transaction closed, Bitcoin then made a demand for termination fees after the funds made available for that purpose were no longer available to DDD to pay them. Only by enforcement of Bitcoin's promise not to pursue the payment of termination fees would an injustice to DDD be avoided in this instance.

As such, Bitcoin should now be estopped from demanding termination fees pursuant to the doctrine of promissory estoppel.

### 2. Equitable Estoppel

The elements of the defense of equitable estoppel are: (1) an admission, statement, or act inconsistent with a claim afterward asserted, (2) action by another in reasonable reliance upon

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

that act, statement or admission, and (3) injury which would result to the relying party if the first party were allowed to contradict or repudiate the prior act, statement or admission.[2]

Mark Smith, Bitcoin Director of Business Development, stated more than one time in his correspondence with DDD that no termination fees would be charged to DDD because of the termination of the Bitcoin agreements made necessary by the sale of DDD's stores. These statements are in direct opposition to the position taken by Bitcoin after the sale of DDD's stores. DDD relied on Bitcoin's promise that it would not pursue DDD for the payment of such fees. As discussed above, funds had been allocated for the payment such fees as part of the sale transaction. Funds that are now no longer available to DDD for the payment of these fees now that the sale has closed. As such, DDD has been damaged by its reliance on Bitcoin's promises not to pursue DDD for the termination fees. If the Court permits Bitcoin to contradict its prior promise and claim such fees now, DDD would suffer significant damage as a result.

Accordingly, whether by the doctrine of equitable estoppel or promissory estoppel, Bitcoin should be estopped from pursuing DDD for termination fees now that their contractual relationship has been terminated.

III.    **CONCLUSION**

Based on the foregoing, DDD seeks an order from this court declaring any proposed written agreements with the defendant voided unenforceable with a specific finding that the

---

[2] See *Colonial Imports, Inc. v. Carlton Northwest, Inc.*, 121 Wash.2d 726, 734, 853 P.2d 913, 918 (1993) (citing *Robinson v. Seattle,* 119 Wash.2d 34, 82, 830 P.2d 318, *cert. denied,* ——– U.S. ——–, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992).

SUPPLEMENTAL MEMORANDUM TO MOTION
FOR DECLARATORY RELIEF
- 5

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

choice of law and venue and arbitration terms in Defendant's proposed agreements are unenforceable and void as well.

Further, notwithstanding the determination of the Court on the formation Defendant's proposed agreement, DDD seeks an order from this Court declaring that the Defendant is estopped from seeking or demanding termination fees from DDD.

DATED this 6th day of February, 2023.

HAWLEY TROXELL ENNIS & HAWLEY LLP

By: _____
MICHAEL R. MERRITT, WSBA #60094
Counsel for Plaintiff DDD, Inc.

SUPPLEMENTAL MEMORANDUM TO MOTION
FOR DECLARATORY RELIEF
- 6

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies under penalty of perjury under the laws of the State of Washington, that on the ⟋⟍th day of February, 2023, the foregoing was delivered to the following persons in manner indicated:

John T. Bender                                    ☐ By Hand Delivery
Corr Cronin LLP                                   ☒ By U.S. Mail
1015 Second Avenue, Floor 10                      ☐ By Overnight Mail
Seattle. WA 98104-1001                            ☐ By Facsimile
                                                  ☒ By Electronic Mail:
                                                  jbender@corrcronin.com


Mary Newlin, Legal Assistant

Hawley Troxell Ennis & Hawley LLP
422 W. Riverside Ave., Suite 1100
Spokane, Washington 99201
509.624.5265